J-S45027-25                2026 PA Super 48

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
ANTOINE ALPHONZO HUNTER :
:
Appellant : No. 372 MDA 2025

Appeal from the PCRA Order Entered February 21, 2025
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-CR-0001522-2016

BEFORE:   STABILE, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY MURRAY, J.:                    **FILED MARCH 17, 2026**

Antoine Alphonzo Hunter (Appellant) appeals from the order dismissing

his timely first petition filed under the Post Conviction Relief Act (PCRA), 42

Pa.C.S.A. §§ 9541-9546.  After careful review, we reverse the order, vacate

Appellant's judgment of sentence, and remand for a new trial.

This Court previously summarized the facts underlying Appellant's

convictions as follows:

> On December 14, 2015, six individuals traveled to the residence
> of the victim in the instant case, Deval Green [(the victim)], to
> steal from him.  Those six individuals included Appellant,
> Appellant's co-defendant at trial—Tarence Lamar Reed [(Reed)]—
> and four other individuals: Damien Calloway [(Calloway)], Tyree
> Swindell [(Swindell)], Gerald Scarlett [(Scarlett)], and Cheyenne
> Kline-Branche [(Kline-Branche)], all of whom pled guilty prior to
> the jury trial, and provided testimony at trial.

---

[*] Retired Senior Judge assigned to the Superior Court.

On December 13, 2015, the six individuals devised a plan to steal from the victim at his residence located at 140 Quarry Road, Chambersburg, Pennsylvania. That night, several of the co-conspirators traveled to Giant grocery store, where Reed and Swindell went inside to purchase duct tape and cigarettes. The others waited in the parking lot in a gold van owned by the mother of Kline-Branche.

In the early hours of December 14, 2015, the six individuals left the residence of Kline-Branche and Scarlett in two vehicles, a red sedan and the gold van. Each vehicle was parked a distance from the victim's residence. Reed then approached the residence, along with Appellant and Calloway, while the other three co-conspirators waited at the cars. After approaching the residence, the victim met the three co-conspirators at the door. While Calloway waited outside, Reed and Appellant went inside, where they encountered the victim's fiancée[,] Faith Carbaugh [(Carbaugh)], … Carbaugh's [teenage] son [B.D.], and [the victim's and Carbaugh's three-year-old] daughter. Reed and Appellant took a black backpack from the residence, along with two video gaming systems—an Xbox and a PlayStation 4. During the course of this incident, while on the front steps of the residence, Reed shot the victim in the shoulder, leg, and neck, thereby causing the victim's death.

Reed, Appellant, and Calloway then returned to the two vehicles, and left the victim's residence. Reed and Appellant traveled in the red sedan to Hagerstown, Maryland. The other four individuals left the residence in the gold van, and traveled back to Kline-Branche and Scarlett's residence, dropping Calloway off along the way.

*Commonwealth v. Hunter*, 217 A.3d 377, 759 MDA 2018 (Pa. Super. 2019) (unpublished memorandum at 1-2) (original brackets omitted) (quoting Trial Court Opinion, 4/23/18, at 3-4).

In describing the Pennsylvania State Police's (PSP) investigation of the shooting, we rely on the affidavit of probable cause (the affidavit) submitted in support of PSP's January 19, 2016, application for a warrant to search an

iPhone seized from Appellant during his arrest on December 29, 2015. As discussed below, this warrant application is relevant to the issues on appeal.

On December 14, 2015, in the hours following the shooting, PSP interviewed Carbaugh and B.D. Affidavit of Probable Cause, 1/19/16, at 1. Both indicated they recognized one of the intruders as a friend of the victim, whom they knew only as "Blue." *Id.* at 1-2. B.D. stated this intruder wore distinctive gold shoes he had previously seen "Blue" wearing. *Id.* Upon being shown photo arrays, Carbaugh and B.D. each identified Swindell as "Blue." *Id.* at 2.

On December 15, 2015, PSP arrested Swindell and searched his cell phone. Pertinently, the affidavit alleged as follows:

> **On** [**December 16, 2015,**] **a court order was obtained for the subscriber information relating to text messages between Swindell** … **and the name "HT," associated with the phone** [**number XXX-XXX**]**-2505** [(**the suspected number**)]. **Upon viewing Swindell's contact list**[**, the suspected number**] **was listed under the name "HT." Subscriber information received from Sprint** [**pursuant to the December 16, 2015, court order**] **indicated that the** [**suspected number**] **belonged to the account holder identified as** [**Appellant**]…. **Furthermore, cell phone records received for Swindell's phone indicate text messages …between** [**Appellant**] **and Swindell** [**around the time of the incident**]. Text messages were obtained from Swindell's phone … in which Swindell states [to Appellant,] "Ducc an go around the front from the back." [Appellant] then sent a reply text to Swindell stating, "Make that text." Swindell then sent another text to [Appellant stating,] "They getting ready to come out," followed by, "They about to come out," and finally, "Hurry up." … **Furthermore, cell phone records indicate that** … [**Appellant's cell**] **phone accessed a cell phone tower near the victim's residence at the time of the crime.**

*Id.* at 4 (emphasis added; some capitalization and punctuation modified).

On December 19 and 21, 2015, PSP interviewed Swindell, Kline-Branche, Calloway, and Scarlett (collectively, the cooperators). *See id.* at 2-3. Each of the four cooperators claimed the four drove to the victim's residence together in a gold van owned by Kline-Branche's mother. *Id.* Swindell claimed they intended to buy marijuana from Carbaugh, though the other three cooperators admitted they planned to rob the victim and Carbaugh. *Id.* These three claimed the four cooperators had been at Kline-Branche's residence earlier that evening when two or three other men arrived, and the group then planned the robbery. Kline-Branche identified three other men involved in the robbery: "Shottie," "Okie," and "Muhammad." *Id.* at 2. Swindell identified Shottie and "two unknown Muslim males." *Id.* Calloway and Scarlett each identified only two other men—Shottie and one unknown black male. *Id.* at 3. Each of the four cooperators stated that Shottie and the other man/men drove to the victim's residence in a red sedan, accompanied by the four cooperators in the gold van. *Id.* at 2-3. Scarlett and Calloway both stated that Scarlett had given to Shottie a .40-caliber handgun owned by Kline-Branche, and told Shottie not to shoot anyone. *Id.* at 3.

Calloway claimed he went to the victim's porch and served as lookout during the robbery, while the other three cooperators denied leaving the van. *Id.* at 2-3. Calloway stated Shottie and the unknown black male (who carried

a shotgun) approached the residence. *Id.* at 3. Calloway claimed Shottie shot the victim on the porch before entering the residence, and the victim subsequently got up and began fighting with the unknown male. *Id.* Calloway indicated he began running to the van when he saw Shottie exit the residence, whereupon Calloway heard two more gunshots. *Id.* Swindell stated that Calloway returned to the van carrying Xbox and PlayStation game consoles, and told Swindell that Shottie had shot the victim three times. *Id.* at 2. Kline-Branche and Scarlett both stated only that they heard gunshots, and then the four cooperators fled together in the van. *Id.* at 2-3. Kline-Branche and Scarlett also stated that the two of them subsequently drove to Hagerstown[1] to recover the .40-caliber handgun. *Id.* They claimed they met with Shottie (Kline-Branche also claimed "Okie" was present) but did not get the handgun back. *Id.*

On December 21, 2015, PSP showed Kline-Branche two photo arrays "for the purposes of identifying 'Shottie' and another unknown actor who had since been identified as 'HT.'" *Id.* at 3. Kline-Branche identified Reed as Shottie, but did not identify HT. *Id.* at 4. The same day, PSP showed Calloway the photo arrays. *Id.* Calloway identified Reed as Shottie and Appellant as HT. *Id.*

---

[1] Hagerstown is located approximately 25 miles from Chambersburg. *See* N.T., 9/20/17, at 35.

On December 22, 2015, the Commonwealth charged Appellant with one count each of criminal homicide, robbery, and theft by unlawful taking, and two counts of conspiracy.[2]  The Commonwealth also charged Reed and the four cooperators with similar offenses.

Pertinently, the affidavit alleged as follows:

> On [December 29, 2015,] at approximately [9:30 a.m., Appellant] was … apprehended by the Maryland State Police [(MSP)] Fugitive Unit.  **Upon being taken into custody, [Appellant] was in possession of a white-in-color iPhone.**[3]  **On [January 8, 2016, the affiant] advised [MSP] to power on the [iPhone] they had in evidence belonging to [Appellant].  [The affiant] subsequently advised MSP to call the [suspected number] associated with [Appellant]** … **to verify if the white iPhone in evidence was associated with [the suspected number] that was obtained from Swindell's contact list for [Appellant].  MSP related that, upon powering on the white iPhone seized from [Appellant] and dialing the [suspected number,]** … **the white iPhone rang**.

*Id.* at 4 (emphasis and footnote added; some capitalization and punctuation modified).

_____

[2] 18 Pa.C.S.A. §§ 2501(a), 3701(a)(1)(i), 3921(a), 903(a).

[3] We frequently hereinafter refer to this iPhone as "the iPhone."  On the day of his arrest, Appellant participated in a video-recorded interview with PSP.  *See* N.T., 9/20/17, at 15-16.  Appellant stated he had been in Hagerstown at the time the robbery.  *Id.* at 43-44.  He further stated he did not have his phone at the time of the robbery; rather, he stated many people borrowed his phone and he did not know who had it at the time of the robbery.  *Id.* at 34, 43, 46-47, 139-40.  Though not mentioned in the affidavit, Appellant also possessed a second cell phone at the time of his arrest, a black LG flip phone.  *See* N.T., 9/21/17, at 19.

On the basis of the foregoing averments, PSP applied for a search warrant on January 19, 2016. The warrant application described the item to be searched as a white iPhone with an "unknown serial number, seized from the person of [Appellant] following his arrest, **which was confirmed to be associated with the** [**suspected number**] **belonging to** [**Appellant**]." Application for Search Warrant, 1/19/16, at 1 (emphasis added). The application identified the items to be searched for and seized as follows:

> Phonebook/Contact list; call logs, phone calls from December 13, 2014 to present (to include log of phone calls and voicemails, calls that were: completed, dropped, missed, failed, deleted); **text messages (to include SMS and MMS, messages that were: saved, deleted, failed, completed, draft messages)** from December 13, 2015 to present, the following keywords/phrases: "C Money" [(the victim's nickname)], "HT," "H Town," "H Town Okie," "Okie," "Blue," "Shottie," "Jamaica" [(Scarlett's nickname)], "hit a lick," and the following names: Tarance Lamar Reed, Gerald Scarlett, Tyree Swindell, Faith Carbaugh, Deval Green, Damien Calloway, Cheyenne Kline-Branche. **Affidavit of** [**probable cause**] **is incorporated by reference**.

*Id.* (emphasis added).

Relevant to the affidavit's incorporation within the items to be searched for and seized, the affidavit included a 9-page "Attachment A." Without mentioning any facts specific to the instant matter, Attachment A generally described the data storage features of cell phones and the data analysis techniques of law enforcement. *See generally* Affidavit of Probable Cause, 1/19/16, Attachment A. Attachment A's list of 24 "generic evidence sources"

- 7 -

typically found in cell phones included "Notes."  *Id.* at 4.  On its last page,

Attachment A stated as follows:

> With respect to the items to be search for and seized, pursuant to this warrant, the executing law enforcement officer(s) is/are authorized to view, photograph, record, copy, forensically image, and conduct forensic analysis of any and all data, programs and applications on the above-described cellular communication device(s), as well as on any data storage devices and[/]or mediums physically or wirelessly attached to those cellular communications device(s).

*Id.* at 9.

A magisterial district justice granted the warrant application.  PSP initially could not execute the warrant because the iPhone was password-protected, and the warrant expired.  *See* Affidavit of Probable Cause, 3/14/16. After discovering the password,[4] on March 14, 2016, PSP applied for and obtained a renewed warrant.[5]  *Id.*  PSP executed the warrant by performing an "extraction" and forensic analysis of the iPhone's contents.  *See* N.T., 9/20/17, at 120.

Stephen Kulla, Esquire (trial counsel), represented Appellant.  On September 20, 2016, the Commonwealth filed a criminal information

---

[4] PSP Trooper Jeffrey Baney (Trooper Baney), the affiant, testified at trial that Appellant, while in custody in Maryland, used a four-digit PIN in connection with making a phone call from jail.  N.T., 9/21/17, at 102.  Police used "[d]ial tone decipher" to discern that four-digit PIN.  *Id.*  The same four digits proved to be the iPhone's password.  *Id.*

[5] For purposes of the issues on appeal, the two warrants and associated affidavits of probable cause are substantially identical, and we refer to them collectively in the singular.

amending Appellant's charges to one count each of second-degree murder[6] and burglary, and three counts each of robbery and conspiracy.[7]   The Commonwealth charged Reed with first-degree murder.   The Commonwealth filed a notice of joinder, indicating its intent to try all six co-defendants together.  **See** Notice of Joinder, 9/19/16.

On Appellant's behalf, trial counsel filed a notice of alibi defense, indicating Appellant claimed to have been at an address in Hagerstown at the time of the murder.  **See** Revised Notice of Alibi Defense, 1/3/17.  Trial counsel also filed an omnibus pre-trial motion, requesting that Appellant's trial be severed from the trial of the other co-defendants, and that Calloway's photo-array identification of Appellant be quashed.  **See** Omnibus Pre-trial Motion, 1/19/17.  The trial court denied Appellant's omnibus pre-trial motion.  **See** Opinion and Order, 5/19/17.  Trial counsel also filed a pre-trial motion *in limine*, seeking the exclusion from evidence of Appellant's December 29, 2015, video-recorded interview with PSP.  **See** Motion *in Limine*, 8/31/17. The trial court denied the motion.  **See** Order, 9/7/17.

Before trial, the four cooperators entered into plea agreements, whereby each agreed to cooperate with the Commonwealth and provide

---

[6] 18 Pa.C.S.A. § 2502(b) ("A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony").

[7] The three conspiracy charges involved, respectively, conspiracy to commit burglary, robbery, and theft.

truthful testimony at the trial of Appellant and Reed, in exchange for a sentence of 5 to 10 years' imprisonment. At the time of trial, each had pled guilty to robbery and awaited sentencing. *See*, *e.g.*, N.T., 9/14/17, at 107-09 (Kline-Branche's testimony regarding her plea agreement).

The matter proceeded to a 10-day jury trial on September 11-22, 2017.[8] At trial, B.D. testified that he was in bed on the night in question when he heard "tussling." N.T., 9/12/17, at 83. B.D. opened his bedroom door and a black male, who had a neck gaiter covering the bottom half of his face, pointed a handgun at B.D.'s face. *Id.* at 83-85. The man led B.D. into the living room, where Carbaugh was holding her three-year-old daughter. *Id.* at 84. The man asked for the location of money and drugs. *Id.* at 86. B.D. testified that another black male, who wore a mask and wielded a shotgun, entered the residence. *Id.* at 87-90. According to B.D., the second man was taller than the first, and wore gold Nike Foamposite shoes that B.D. had previously seen worn by the victim's friend, "Blue." *Id.* at 90-91. B.D. testified that the man with the handgun went out to the porch, and B.D. heard several gunshots. *Id.* at 99-100. The men took Carbaugh's backpack, as well as video game consoles, and left. *Id.* at 98-102.

After the robbery, B.D. identified Swindell as "Blue" in a photo array. *Id.* at 103-04. B.D. testified that, earlier that evening, Carbaugh had said

---

[8] We limit our summary of the voluminous trial evidence to that most relevant to the instant appeal, *i.e.*, evidence of Appellant's involvement in the crimes.

Swindell would be coming to the residence to purchase marijuana. *Id.* at 72-73, 105. At trial, B.D. initially identified Swindell as the shotgun-wielding intruder. *Id.* at 111. B.D. testified that Swindell had visited the residence on a number of occasions and had eaten dinner there within a week before the robbery. *Id.* at 112. B.D. testified that he recognized the shotgun-wielding man as having Swindell's eyes, gold shoes, and New York accent. *Id.* at 112-13, 126. However, B.D. testified that, though he had once been "positive" that the shotgun-wielding man was Swindell, he no longer thought it was Swindell, "[j]ust because of what I've been reading on stuff." *Id.* at 126.

B.D. testified that he did not know who Appellant was, did not remember seeing him before, and did not identify him as being involved in the robbery. *Id.* at 111-15. B.D. also did not identify Reed. *Id.* at 124.

Carbaugh testified that, on the night of the robbery, the victim answered a knock at the door and was pulled outside. *Id.* at 149. Carbaugh heard scuffling, followed by six gunshots. *Id.* Carbaugh testified that two black men entered the residence, one with a handgun and the other with a shotgun or rifle, both with masks covering the bottom of their faces. *Id.* at 151-53, 157-61. Carbaugh described the shotgun-wielding man as tall and thin, approximately 5'10'' and 150 pounds.[9] *Id.* at 159, 201. Carbaugh testified

---

[9] According to PSP, at the time of his arrest on December 29, 2015, Appellant was 5'9" or 5'10'' and weighed 190 pounds. *See* N.T., 9/20/17, at 40-41. At the time of trial, Appellant weighed 225.8 pounds. N.T., 9/21/17, at 164 (wherein Appellant stood on a scale in the courtroom).

- 11 -

that after the robbery, when B.D. told her he recognized the shotgun-wielding man as Swindell, she, too, realized it was Swindell. *Id.* at 165-66. Carbaugh testified that she identified that man as Swindell based on his eyes, mannerisms, voice, gold shoes, and clothes. *Id.* at 166-68. Carbaugh indicated she had known Swindell for eight years, and at the time of the robbery, Swindell owed her and the victim money for an ounce of marijuana. *Id.* at 162, 202-03; *see also id.* at 172 (Carbaugh testifying that she, the victim, and B.D. all sold marijuana). At trial, Carbaugh positively identified Swindell as the shotgun-wielding man. *Id.* at 166-67, 209. Carbaugh did not identify Appellant, and testified that Appellant had never been to her residence. *Id.* at 199.

Swindell testified that he had initially denied his involvement in the robbery and told PSP three or four false stories. N.T., 9/13/17, at 19-23. At trial, Swindell testified that he went to the victim's residence with Calloway, Kline-Branche, and Scarlett, along with "[s]ome Arab dude and some other guy." *Id.* at 23; *see also id.* at 55 (Swindell identifying "Shottie" in addition to "the Arab dude" and "some other dude"). Swindell claimed he initially planned to buy marijuana from the victim, but "Scarlett came up with the idea to" rob the victim. *Id.* at 25.

Swindell admitted his nickname is "Blue," but denied he had ever owned or worn gold Nike Foamposite shoes. *Id.* at 14, 41-43. He testified he had seen shoes like that one time, at Kline-Branche's house just before the

robbery, but he claimed he did not see the face of the person wearing them. *Id.* at 41-43. Swindell testified he had never seen this person before and did not know their name. *Id.* at 70-71. Asked to describe the person, Swindell stated, "All I seen was the shoes." *Id.* at 71; *see also id.* at 72 (Swindell testifying he assumed the person was male because the shoes were big). Swindell testified "the Arab dude" had "a big beard," "looked Middle Eastern," and wore "weird looking shoes" that resembled moccasins. *Id.* at 48-49; *see also id.* at 50 (Swindell testifying the Arab man was not in the courtroom).

Swindell identified himself and "Shottie" in a still photograph taken from Giant grocery store surveillance footage in the hours before the robbery. *Id.* at 26-27. Swindell identified "Shottie" as Reed, and pointed him out in the courtroom. *Id.* at 27-28. Swindell testified he had not previously known Reed and met him for the first time the night of the robbery. *Id.* at 45. Swindell indicated that he did not see anyone else in the courtroom who was involved in the robbery. *Id.* at 28.

Swindell testified that he rode to the victim's house in the gold van with Kline-Branche and Scarlett, while Calloway, Reed, "the Arab dude," and "some other dude" went in a red car. *Id.* at 55, 70. Swindell stated that he remained in the van with Kline-Branche, and Scarlett got out of the van but remained nearby. *Id.* at 35, 58. Swindell also testified that Scarlett had Swindell's phone at the time, because Scarlett did not have his own phone. *Id.* at 35-36, 58. According to Swindell, Calloway told him "Shottie and some other

dude went inside" the residence. *Id.* at 41; *see also id.* at 35 (Swindell testifying that Scarlett "said that Calloway went with Shottie and some other dude"). Swindell testified that he heard one gunshot; Scarlett ran back to the van; and they drove away. *Id.* at 34-35, 58-59.

Swindell testified that, later that night, he went with Kline-Branche and Scarlett to Hagerstown, where they met with Reed and "[t]he Arab dude." *Id.* at 63-64, 66. According to Swindell, Scarlett argued with Reed, telling Reed "he wasn't supposed to do that," and Reed said, "I shot him." *Id.* at 65-66.

Swindell acknowledged that his phone records showed communications between his phone and the suspected number around the time of the robbery, and that his phone had the suspected number saved as a contact under "HT." *Id.* at 82-86. However, Swindell denied knowing anybody named "HT." *Id.* at 85. Asked why "HT" was in his phone, Swindell reiterated that he had let Scarlett use his phone. *Id.* Asked whether "HT" was in the courtroom, Swindell testified he did not know who "HT" was. *Id.* at 89. Swindell confirmed that he did not identify anyone in the courtroom (other than Reed) as having been involved in the robbery. *Id.* at 90. Swindell testified that he had never seen Appellant before, and Appellant had not been involved. *Id.* at 98.

Kline-Branche testified that she drove Swindell, Scarlett, and Calloway to the victim's residence in the gold van. N.T., 9/14/17, at 126. Kline-Branche stated that Reed, Appellant, and an "unknown man" drove there in a red car.

*Id.* at 127. She described the unknown man as a black male between 40 and 50 years old, about 5'8'', husky, with a grayish beard. *Id.* Kline-Branche testified she had met Reed in 2014; Reed was from Hagerstown; and Reed's nickname was "Shottie." *Id.* at 119, 169.

Kline-Branche testified she met Appellant for the first time that night; she did not know where Appellant lived or if he had a nickname; and she did not know anyone with the nickname "HT." *Id.* at 128, 169. Kline-Branche described Appellant, at the time of the robbery, as 6'0'' or 6'1'', "very husky," about 230 pounds, with a "large beard," and stated she "couldn't see his whole face because he had sunglasses on." *Id.* at 180-81. Kline-Branche testified she believed Appellant was wearing gold shoes that night, but acknowledged she previously told police Swindell had been wearing the gold shoes. *Id.* at 126, 181; N.T., 9/15/17, at 50-51.

Kline-Branche testified that Calloway approached the victim's residence with two people from the red car. N.T., 9/14/17, at 134-35. Kline-Branche believed these two were Reed and Appellant, though she testified it was dark and she could only see "the shapes of people[.]" *Id.* Kline-Branche and Scarlett remained in the van, with Swindell just outside the van. *Id.* at 133. According to Kline-Branche, after she heard two gunshots, Calloway returned to the van; Reed and Appellant returned to the red car; and they drove away. *Id.* at 136-37, 142-43.

Kline-Branche testified that, later that night, she, Scarlett, and Swindell drove to Hagerstown "to try to get the full story of what happened inside the residence" from Reed. *Id.* at 166. In Hagerstown, they met with Reed and the unknown black male Kline-Branche had seen earlier that night. *Id.* at 167.

Kline-Branche testified that police had shown her photo arrays on December 21, 2015. N.T., 9/15/17, at 7-10. She acknowledged that she had identified Reed in a photo array, but had not identified Appellant. *Id.* at 11-13. Kline-Branche identified Reed in the courtroom. *Id.* at 24. Asked whether anyone else in the courtroom was involved in the robbery, Kline-Branche indicated that she had not been able to identify Appellant before, but "now that I've been incarcerated, I know who—well, what he looks like." *Id.* Kline-Branche initially stated she did not know how to answer the question but, upon further questioning, she identified Appellant in the courtroom as a person she recognized as going to the victim's residence with Reed. *Id.* at 25-27.

On cross-examination, Kline-Branche acknowledged she had not identified Appellant in her initial written police statement. *Id.* at 87-92. She also acknowledged that she initially told police the man, whom she later claimed was Appellant, weighed 300 pounds. *Id.* at 96-97. Kline-Branche agreed she never mentioned Appellant until after she was represented by an attorney who advised her that she would have to give police more information if she wanted to secure a plea deal. *Id.* at 93-95. Kline-Branche

acknowledged that, by that time, she had heard Appellant's name while she was incarcerated. *Id.* at 95. Kline-Branche further testified that, on the day of her trial testimony, her attorney told her Swindell "pretty much blew his [plea] agreement" because of his trial testimony. *Id.* at 101-02. Kline-Branche agreed that the Commonwealth may have deemed Kline-Branche to have violated her own plea agreement if she did not identify Appellant in court. *Id.* at 102. Kline-Branche further agreed that she could not say with certainty that Appellant—the man sitting in the courtroom—was the man involved in the robbery. *Id.*

On redirect, Kline-Branche agreed with the prosecutor that she did not identify Appellant "solely because [she'll] say anything to get a [plea] deal," but because she took an oath to tell the truth. *Id.* at 115. She testified that "[t]he man [she] saw that night had on sunglasses and [had] a longer beard" than Appellant did at the time of trial. *Id.* at 116. She testified Appellant "looks similar, but I cannot say that he looks exactly like that person." *Id.* Upon further questioning, Kline-Branche again identified Appellant in the courtroom as the man she recognized as involved in the robbery. *Id.* at 117-18.

On re-cross-examination, Kline-Branche again expressed uncertainty as to whether Appellant was the man involved. *Id.* at 124. She testified that she "believe[d] it to be him" because he has the same facial structure, and

because she heard in jail that Appellant was the man involved. *Id.* at 124-25.

Scarlett testified that a conversation about robbing the victim took place between himself, Swindell, Kline-Branche, Calloway, and three other men whom Scarlett had never met before that night. *Id.* at 197, 202, 206. Scarlett stated that, as far as he knew, these three men were from Hagerstown. *Id.* at 197. He did not recall anyone wearing gold shoes. *Id.* at 205, 220. Scarlett testified he did not know the victim, and it was Swindell who suggested robbing the victim. *Id.* at 201.

Scarlett testified he rode to the victim's residence in the gold van with Swindell, Kline-Branche, and Calloway, and the three Hagerstown men traveled in a red car. *Id.* at 209, 219. According to Scarlett, Calloway exited the van and headed toward the red car. *Id.* at 215. Scarlett remained in the van with Kline-Branche. *Id.* at 215. Scarlett testified that Kline-Branche had a purple 9mm handgun, but he did not think any of the other participants were armed. *Id.* at 216. Scarlett heard a gunshot, and Swindell got back in the van. *Id.* at 221. After another gunshot, Calloway ran back to the van carrying a duffel bag, and they left. *Id.* at 221-22.

Scarlett testified that, when they returned to Kline-Branche's house, they discovered that her .40-caliber handgun, which had been in a box on the living room table, was missing. *Id.* at 225-26; *see also* N.T., 9/18/17, at 28-29 (Scarlett denying he had given the handgun to "Shottie" before the

robbery, contradicting his prior statement to police). Scarlett testified he went to Hagerstown with Kline-Branche and Swindell later that night, in order to "find out what happened that night," including what happened to the missing handgun. N.T., 9/15/17, at 233-34, 238-29.

Scarlett stated one of the Hagerstown men was a "[d]ude named Shottie," whose phone number Scarlett had obtained earlier that night. *Id.* at 235. Scarlett testified he did not know the other two Hagerstown men and did not have their phone numbers. *Id.* at 235-36. Scarlett called Shottie and, in Hagerstown, met with Shottie and "[a]nother dude" whom Scarlett did not know. *Id.* at 235-37. Scarlett testified they did not recover the missing handgun, and he never received any of the proceeds of the robbery, which were supposed to have been split among the participants. *Id.* at 239.

Scarlett initially testified that he did not see any of the three Hagerstown men in the courtroom, and did not identify anyone in the courtroom as being involved in the robbery. *Id.* at 241. On his second day of testimony, Scarlett identified Reed as Shottie. N.T., 9/18/17, at 30-31. Scarlett testified that he did not remember Appellant. *Id.* at 31. On cross-examination, Scarlett again confirmed he did not remember Appellant, and agreed he had not identified Appellant in any of his previous statements to police. *Id.* at 35-36. Scarlett also agreed he previously described the man who went into the victim's residence with Reed as taller than Scarlett himself, who is 6'1". *Id.* at 36-37;

*see also id.* at 37 (comparison of their heights in the courtroom indicated Appellant was two to three inches shorter than Scarlett).

On redirect, after being shown a photograph of Appellant that was taken closer in time to the robbery, Scarlett testified he recognized the person in the photo, and agreed it was Appellant. *Id.* at 77-79. However, it is not clear that Scarlett identified Appellant as being involved in the robbery. *Id.* at 77-79. On re-cross-examination, Scarlett agreed he had seen Appellant in the Franklin County jail, where the photo of Appellant had been taken, but denied that he recognized Appellant from jail. *Id.* at 88-89.

Calloway testified that, on the night in question, he had been at Kline-Branche's house with Kline-Branche, Scarlett, Swindell, Reed, and Appellant. N.T., 9/19/17, at 23. Calloway stated he had met Reed on one previous occasion and met Appellant for the first time that night. *Id.* at 24-25. Calloway testified Reed and Appellant were from Hagerstown, and Appellant had a large beard. *Id.* at 25-26. Calloway initially stated Swindell was wearing gold shoes that night, but then stated it was Appellant who wore gold shoes. *Id.* at 28-30; *see also id.* at 82 (Calloway agreeing that, at Appellant's preliminary hearing, he testified he did not recall anyone wearing gold shoes).

Calloway testified that Reed and Appellant went to the victim's residence in a red car. *Id.* at 31. Calloway stated that he, Scarlett, Swindell, Reed, and Appellant exited the vehicles at the victim's residence. *Id.* at 35. According

to Calloway, Appellant had a double-barreled shotgun, while Scarlett gave a .40-caliber handgun to Reed and told Reed not to shoot anybody. *Id.* at 35-36, 39. Calloway testified that he and Reed wore bandanas on the bottom half of their faces, and Appellant wore sunglasses but had nothing covering the bottom half of his face. *Id.* at 37-38.

Calloway testified he went to the victim's porch "to be a lookout." *Id.* at 40. According to Calloway, the victim came out onto the porch and "was ambushed." *Id.* at 41. The victim began fighting with Appellant, and Reed shot the victim. *Id.* Calloway testified Reed entered the residence while Appellant stood over the victim on the porch. *Id.* at 43. Calloway denied Appellant ever went inside the residence. *Id.* After approximately five minutes, Reed exited the residence with two bags. *Id.* at 43-44. Calloway began running, heard another gunshot, and then Reed tossed him a duffel bag. *Id.* at 44, 46. Calloway got back in the van; Reed and Appellant got in the red car; and they left. *Id.*

After the robbery, Calloway identified Reed and Appellant in photo arrays. *Id.* at 53-56. At trial, Calloway identified both Reed and Appellant in the courtroom. *Id.* at 60-61. Calloway testified that Appellant looked bigger at trial than he did at the time of the robbery, but otherwise looked the same. *Id.* at 61.

On cross-examination, Calloway agreed that he first gave a statement to police on December 18, 2015, in which he denied any involvement in the

robbery. *Id.* at 91-92 (Calloway agreeing his entire December 18, 2015, statement was a lie). *Id.* at 91-92. In a second statement on December 21, 2015, Calloway claimed he remained in the van during the robbery, and did not identify Appellant. *Id.* at 93, 96. Instead, Calloway had referred to "the other guy," and indicated "the other guy" was 6'2''. *Id.* at 96-98.

Calloway testified there were only two men from Hagerstown involved, not three, and that his co-defendants would be lying if they said there were three. *Id.* at 111. Calloway did not recall Appellant having a nickname, and testified he never heard anyone call Appellant "HT" or "Ocky." *Id.* at 112-13. Calloway testified he learned Appellant's name by reading a newspaper article that featured a photo of Appellant and identified him as involved in the robbery. *Id.* at 114-15.

Calloway denied that he was hoping to get a plea deal when he testified at Appellant's preliminary hearing. *Id.* at 104. However, upon further questioning, Calloway admitted that after the preliminary hearing, he sent Appellant a note in jail, telling Appellant that Calloway had expected to get a plea deal as a result of his testimony but had not gotten one. *Id.* at 104-05.

On December 29, 2015, the date of his arrest, Appellant participated in a video-recorded interview with Trooper Baney, PSP's lead investigator of the murder/robbery case. N.T., 9/20/17, at 12, 15-16. At trial, the Commonwealth played the video of Appellant's interview for the jury. *See* N.T., 9/19/17, at 139. In his own trial testimony, Trooper Baney discussed

the pertinent points of Appellant's interview. *See* N.T., 9/20/17, at 33-35, 42-47, 139-40, 158; N.T. 9/21/17, at 18-20, 55.

Appellant stated that he had been in Hagerstown at the time of the robbery, at an address on Locust Street. N.T., 9/20/17, at 43-44. Appellant maintained he had never been to Chambersburg or the state of Pennsylvania. *Id.* at 35. Appellant stated he had known Reed for approximately eight months, and referenced Reed as being among the people "he hangs out with[.]" *Id.* at 34, 44. Appellant described himself as a rap musician, and stated Reed was his music manager. *Id.* at 34, 45, 158. Appellant stated he may have been with Reed on the date of the robbery, but had not seen Reed in the two weeks preceding his interview. *Id.* at 33-34, 46.

Appellant "related that thousands of people use his phone and it gets passed around." *Id.* at 34. Appellant stated that "he just let people borrow his phone," and he did not have it at the time of the robbery. *Id.* at 43, 139-40. Appellant stated he did not know who had the phone or where it was at the time of the robbery. *Id.* at 46-47. Asked about his phone receiving text messages from Swindell, Appellant stated he had no idea who Swindell was. *Id.* at 43; *see also id.* at 35 (Appellant stated he did not know "Blue").

Appellant stated that his phone number was a number ending in 5700. *Id.* at 42. Trooper Baney suggested Appellant had been untruthful about his phone number, because the number Appellant gave did not match the suspected number. *Id.* In his direct testimony, Trooper Baney did not

mention that Appellant possessed two phones at the time of his arrest, but on cross-examination, Trooper Baney confirmed that Appellant had possessed not only the white iPhone, but also a black LG flip phone[10] and a Samsung tablet. N.T., 9/21/17, at 19. Trooper Baney agreed that when Appellant was asked about the phone he claimed other people used, Appellant stated, "You mean my Sprint phone?" *Id.* Trooper Baney agreed this statement indicated Appellant had more than one phone, and that Appellant would still have had a phone even if other people had borrowed the iPhone. *Id.* at 19-20.

Trooper Baney testified extensively about evidence PSP obtained regarding the co-defendants' cell phones. Pertinently, Trooper Baney described two sources for cell phone evidence: (1) evidence obtained directly from cell phone service providers; and (2) evidence obtained via data extraction and forensic analysis of the cell phones physically seized by PSP. Evidence obtained from service providers includes subscriber information and call detail records (CDR). N.T., 9/20/17, at 21-23. CDR includes call logs identifying the date, time, and duration of phone calls; the other phone number involved in the call; and information identifying the cell tower(s) the subject phone accessed during the call. *Id.* at 23-28. The cell tower information (known as cell-site location information (CLSI)) provides the

_____

[10] The flip phone's assigned number is not identified in the record.

approximate location of the subject cell phone at the time of the call.[11]  *Id.*

CDR also includes text message logs identifying the same information with

respect to text messages, but does **not** include the text content of text

messages.  *Id.* at 23-25, 32.  Trooper Baney testified that a data extraction

of a physical phone involves plugging the phone into a program that

downloads/copies all of the phone's data and organizes it into reports that can

be forensically analyzed.  *Id.* at 115-19.

Trooper Baney testified that PSP obtained subscriber information and

CDR/CSLI data for phone numbers associated with all six co-defendants, as

well as the victim, Carbaugh, and B.D.  *Id.* at 109-10.  PSP physically seized

cell phones from Appellant, Swindell, Scarlett, and Carbaugh, and performed

data extraction/forensic analysis on those phones.  *Id.* at 115.

Trooper Baney testified that PSP's analysis of Swindell's phone revealed

communications with the suspected number around the time of the robbery.

*Id.* at 20.  After identifying Sprint as the service provider for the suspected

---

[11] The United States Supreme Court has observed as follows:

> Cell phones continuously scan their environment looking for the
> best signal, which generally comes from the closest cell site.  Most
> modern devices, such as smartphones, tap into the wireless
> network several times a minute whenever their signal is on….
> Each time the phone connects to a cell site, it generates a time-
> stamped record known as [CSLI].   The precision of this
> information depends on the size of the geographic area covered
> by the cell site.

*Carpenter v. United States*, 585 U.S. 296, 300-01 (2018).

number, PSP obtained and served a court order on Sprint for the suspected number's subscriber information and CDR/CSLI data. *Id.* at 21. The subscriber information for the suspected number indicated that the account was established on March 5, 2015, and the account billing address was "Anton Hunter, 26 Avalon Avenue, Hagerstown, Maryland." *Id.* at 26.

Trooper Baney testified that Swindell's phone had the suspected number saved under two different contacts: "HT" and "Ocky, H-Town." *Id.* at 29-30, 160-61; *see also id.* at 33 (Trooper Baney suggesting "HT" stood for Hagerstown).[12] CDR data disclosed six phone calls and multiple text messages between Swindell's phone and the suspected number on the night of the robbery, and PSP's data extraction of Swindell's phone and Appellant's iPhone showed the content of those text messages. *Id.* at 119-21, 124, 132-35, 148, 160, 171-74, 187-88; *see also id.* at 188 (Trooper Baney describing the timing of the text messages as "right before the homicide occurs."); Affidavit of Probable Cause, 1/19/16, *supra* (quoting text messages between Swindell's phone and the suspected number).

Trooper Baney testified the CSLI data established that, at the time of the robbery, both Swindell's phone and the phone associated with the

---

[12] Trooper Baney testified PSP identified a man from Hagerstown named Octavial Taft, who went by the nickname "Ocky." N.T., 9/20/17, at 164-65. PSP included Taft in a photo array, but no one identified him. *Id.* at 165-67; N.T., 9/21/17, at 130-31. Trooper Baney agreed that Taft was older than the six co-defendants, heavyset, and had a grayish beard. *Id.* at 38.

suspected number were located in Chambersburg, and were accessing the cell tower closest to the victim's residence. N.T., 9/20/17, at 35-36, 144, 184-85, 189; *see also id.* at 185 (Trooper Baney testifying the closest cell tower was located 1.6 miles from the victim's residence). Trooper Baney testified the data indicated that the phone associated with the suspected number was present at the murder scene. *Id.* at 144.

Trooper Baney further testified the CSLI data indicated that Reed's phone and the phone associated with the suspected number were located in Hagerstown within an hour after the murder. *Id.* at 190-91. The data also indicated a phone call between Reed's phone and the suspected number just over two hours after the murder, with both phones located in Hagerstown. *Id.* at 130, 174, 195-96; *see also id.* at 169-74 (Trooper Baney testifying about the co-defendants' cell phone communications on the night of the murder, referencing a demonstrative map showing the cell tower locations).[13]

Trooper Baney testified that Appellant possessed a white iPhone at the time of his arrest on December 29, 2015. *Id.* at 46. The Commonwealth showed the jury a photograph of the iPhone. *Id.* Trooper Baney confirmed

_____

[13] Except for communications with Swindell and Reed, Trooper Baney testified that the phone evidence did not show communications between Appellant and anyone else involved in the instant case. *See* N.T., 9/20/17, at 121. Trooper Baney agreed that none of the phone evidence included anyone referencing Appellant's name (Antoine Hunter) or his initials (AH). N.T., 9/21/17, at 57.

that he verified the iPhone's association with the suspected number, testifying as follows:

> That phone was verified to belong to that number. I subsequently contacted [MSP,] who had that phone in custody, [and] asked them to turn the cellular phone on and provided them with the [suspected] number…. [MSP] called that number. And the cellular phone began to ring.

*Id.* at 123; *see also* N.T., 9/21/17, at 124-25 (on redirect, Trooper Baney reiterating that Appellant possessed the iPhone when arrested, and PSP verified the iPhone's association with the suspected number by having MSP call that number, which caused the iPhone to ring).[14]

Trooper Baney testified that PSP performed a data extraction/forensic analysis of the iPhone using a program called Cellebrite. *Id.* at 119; *see also id.* at 122 (wherein the jury is shown a laptop featuring the Cellebrite extraction of the iPhone). Acknowledging Appellant's claim that other people used his phone and he did not have it at the time of the robbery, Trooper Baney testified that evidence obtained from the iPhone extraction demonstrated that Appellant was the iPhone's user and was involved in the robbery.

---

[14] Trooper Baney also testified that police recovered a .22 rifle at the Maryland residence where Appellant was arrested. N.T., 9/20/17, at 76. However, Trooper Baney admitted no evidence tied that rifle to the instant crimes. N.T., 9/21/17, at 61-62; *see also* N.T., 9/20/17, at 94 (Trooper Baney testifying the murder weapon, a .40-caliber handgun, was never found).

Trooper Baney testified that, during his December 29, 2015, police interview, Appellant used the slang word "geekin." *Id.* at 138. Trooper Baney observed that the iPhone had sent a text message using "geekin" just before the murder. *Id.* at 139 (on December 14, 2015, at 12:35 a.m., the iPhone texted a contact saved as "Rahjaye"[15]: "You geekin. Yo chill. I'm comin. I had to leave real quick. I'm ready come bak and get a room for us ared."). Trooper Baney further observed this text message used the slang word "ared." *Id.* at 138. Trooper Baney testified PSP's analysis disclosed that, between September 15, 2015, and December 22, 2015, the iPhone used "geekin" 21 times and "ared" 322 times in text messages. *Id.* at 138, 145, 186. Trooper Baney described "geekin" and "ared" as "very specific and unique" words, and asserted "we text like we talk." *Id.* at 132.

Trooper Baney also testified that the iPhone used the word "Shottie" many times in text messages. *Id.* at 186. Trooper Baney described many text messages Reed sent to the iPhone in which Reed used the word "Ahk." *Id.* at 125-26 (Trooper Baney reading various text messages from Reed to the iPhone, stating: "How Ahk"; "I know Ahk. Am on it. Just wrote three

_____

[15] On cross-examination by trial counsel, Trooper Baney agreed there was no evidence of Appellant applying the nicknames "HT," "H-Town," or "Ocky" to himself. N.T., 9/21/17, at 21-24. Rather, Trooper Baney agreed that Appellant's Gmail and Facebook accounts used the names "Man2Moody" and "Mugga Mo[o]dy Moo." *Id.* On redirect, Trooper Baney testified that a text message sent from "Rahjaye" to the iPhone referred to the recipient as "Moody." *Id.* at 128-29.

bangers"; "What up Ahk"; "What up Ahk.  Salaam walakum"; "Can you bring my box Ahk?").[16]  Trooper Baney read text messages exchanged between Reed and the iPhone from December 12, 2015, and suggested the messages showed Reed and Appellant discussing a drug transaction.  *Id.* at 127-28 (Reed texting, "Son is a plate"; the iPhone responding, "Who?"; Reed replying, "Dude with the white bitch."); *see also id.* at 127 (Trooper Baney testifying "plate" is slang for a large quantity of marijuana).  The Commonwealth also showed the jury a photograph of Reed holding an AK-47 assault rifle, which, Trooper Baney testified, had been sent from Reed's phone to the iPhone via text message on September 30, 2015.  *Id.* at 149-50.  The jury was shown another photograph obtained from the iPhone, which depicted Reed and Appellant together.  N.T., 9/21/17, at 96.

Finally, Trooper Baney testified that the iPhone's Notes application contained what appeared to be rap lyrics "to songs that [Appellant] was writing."  N.T., 9/20/17, at 153.  Trooper Baney reiterated that Appellant had described himself as a rap musician in his police interview, and agreed these lyrics therefore "stuck out" to him.  *Id.* at 153, 158.  Trooper Baney testified the lyrics were created in the Notes application on December 25 and 26, 2015, which he emphasized was eleven days after the murder.  N.T., 9/21/17, at 134-

---

[16] On cross-examination, trial counsel suggested the Commonwealth sought to equate "Ahk" with "Ocky," and Trooper Baney admitted that "Ahk" was an "Arabic and Hebrew term for brother."  N.T., 9/21/17, at 57-58.

37.     Trooper Baney agreed that he was suggesting the lyrics were "autobiographical."  *Id.* at 150.

Trooper Baney read the lyrics to the jury in their entirety.  N.T., 9/20/17, at 153-57.  Though they contained no clear reference to the facts of or persons involved in the instant case, the lyrics described criminal and violent activity and generally portrayed a life lived on the wrong side of the law.[17]  *See id.*  On redirect, the prosecutor prompted Trooper Baney to re-read certain portions of

_____

[17] The rap lyrics included the following: "I get crafty shots go to your face but nobody seen da maggy Margy goin crazy"; "50 thou worth of vals on da table"; "lost one of my [friends] cause his mans couldnt take it seen homicide and tld da Feds how dat day went"; "Loyalty over everything that will never change but I cannot fuk wit a person dat tell everything"; "start plotting and scheming takin and leavin lost in da world **had nobody to believe in me but my gun** and had to make sure I was eatin everyday was grind"; "in da trenches where grave yards jus ditches **snitches get air lifted** bread winners end up missing"; "got a plate for then 10 thou then I'm layin him down I ain't playin wit em and if he know me then **my goons get em headshot guaranteed complete mission on our side he was just another victim in my eyes** dat coulda easily been me on dat pine box"; "my lil man shorty went ham on bikes doin hits for da fam da moBB is da move"; "**da Feds on me now** I got da juice won't give em nothin to use"; "dey persona don't match wit they do got a gun think it's cool flexing is cool til you gotta see icu"; "**we went for da score left wit a Qtr hit and missed me got me crossing the border**"; "da marshals told my sistah they was goin kill me called flyee he came through got me out da city"; "I work to pay bills everything is a price **I try not to kill but dis shit is real when I put in work I know blood gonna spill I do this for real** I don't got kno chill I kno **I won't stop until** … **I see a jail** and if that day come I kno Imma prevail **runnin from da law right now**."  N.T., 9/20/17, at 153-57 (spelling, grammar, and punctuation in original; emphasis added).

the lyrics, and suggested that references to a "headshot … victim"[18] and "crossing the border" referred to the circumstances of the instant murder. N.T., 9/21/17, at 136-37.

Appellant called William Shumaker (Shumaker) to testify as an alibi witness. *See id.* at 184-220. Shumaker testified he is a friend of Appellant and has known him since high school. *Id.* at 185, 208-09. Shumaker testified he was with Appellant on the night of December 13-14, 2015, at Shumaker's cousin's house on Locust Street in Hagerstown. *Id.* at 188-89. Shumaker stated he and Appellant spent the entire weekend there with two women, Samantha and Melanie, "watch[ing] football and fornicat[ing]." *Id.* at 191-92. Shumaker testified Appellant had a flip phone that weekend, and did not have an iPhone. *Id.* at 193-95.

At the trial's conclusion, the jury convicted Appellant on all counts.[19] On November 2, 2017, the trial court sentenced Appellant to life imprisonment for second-degree murder, and a imposed consecutive aggregate sentence of 28 to 56 years' imprisonment for the remaining convictions.

Appellant timely appealed to this Court, arguing that the verdict was against the weight of the evidence and the trial court erred in denying his pre-trial motion to suppress Calloway's photo identification of Appellant. *See*

---

[18] Instantly, the victim suffered gunshot wounds to the neck, shoulder, and thigh. *See* N.T., 9/12/17, at 23-24, 31.

[19] The jury also convicted Reed on all counts, including first-degree murder.

*Hunter*, 217 A.3d 377. On May 7, 2019, we affirmed Appellant's judgment of sentence. *Id.* On October 22, 2019, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. *Commonwealth v. Hunter*, 218 A.3d 857 (Pa. 2019).

On July 2, 2020, Appellant, *pro se*, timely filed a PCRA petition. The PCRA court appointed counsel, who eventually withdrew his appearance after determining he had a conflict of interest. The PCRA court appointed new counsel, who sought and obtained numerous extensions of time to file an amended petition, but never filed one.

On November 28, 2022, Appellant's current counsel entered his appearance and, on August 31, 2023, filed an amended petition, advancing five claims of trial counsel's ineffective assistance. The Commonwealth filed an answer on December 15, 2023.[20] On October 3, 2024, the PCRA court held an evidentiary hearing, at which trial counsel testified as the only witness. The parties filed post-hearing briefs. On February 21, 2025, the PCRA court filed an opinion and order dismissing Appellant's petition.

---

[20] The Franklin County District Attorney's Office represented the Commonwealth in the instant matter until May 2024. At that time, the Commonwealth filed a notice of conflict, advising that the newly-elected district attorney had previously represented Swindell in connection with Swindell's charges arising from the robbery, including representation of Swindell during his testimony at Appellant's trial. *See* Commonwealth's Notice of Conflict, 5/7/24. The Pennsylvania Attorney General's Office thereafter assumed the prosecution of this matter. *Id.*

Appellant timely appealed. Appellant and the PCRA court have complied with Pa.R.A.P. 1925. Appellant presents the following questions for our review:

1. Whether trial counsel provided [] ineffective assistance of counsel in failing to move to suppress [evidence recovered from Appellant's] cell phone given that the phone was searched and seized before the police obtained a search warrant[?]

2. Should trial counsel have moved to suppress the rap lyrics and text messages from before December 13, 2015, found on [Appellant's] phone because the warrant did not authorize a search of the Notes application which contained the lyrics or text messages from before that date?

3. Whether trial counsel was ineffective in failing to object and move for a mistrial when the prosecutor repeatedly committed prosecutorial misconduct throughout the entire two-week trial by improperly vouching for his own credibility and that of his witnesses and by repeatedly directing the witnesses to the fact that the [victim's] family was present in the courtroom when the witnesses did not give him the desired responses[?]

4. Whether trial counsel should have moved to suppress cell site data from [Appellant's] phone because the police obtained the data without first obtaining a search warrant supported by probable cause in violation of **Carpenter**[, 585 U.S. 296?]

5. Should trial counsel have objected to the admission of evidence that police recovered a rifle from [Appellant's] house in Maryland because there was no link between the gun and the homicide, or in the alternative, should trial counsel have moved to suppress the rifle because the police did not have a search warrant for the house[?]

Appellant's Brief at 4-5.

When reviewing the dismissal of a PCRA petition, we examine "whether the PCRA court's conclusions are supported by the record and free from legal

error." ***Commonwealth v. Johnson***, 289 A.3d 959, 979 (Pa. 2023) (citation omitted).

> The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding. In contrast, we review the PCRA court's legal conclusions *de novo*.

***Commonwealth v. Maxwell***, 232 A.3d 739, 744 (Pa. Super. 2020) (*en banc*) (citations omitted). A PCRA petitioner "has the burden of persuading [an appellate c]ourt that the PCRA court erred and that such error requires relief." ***Commonwealth v. Montalvo***, 205 A.3d 274, 286 (Pa. 2019); ***see also Commonwealth v. Sandusky***, 324 A.3d 551, 564 (Pa. Super. 2024) ("We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party.").

Appellant challenges trial counsel's effectiveness. A PCRA petitioner claiming ineffective assistance of counsel

> will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place."

***Commonwealth v. Johnson***, 966 A.2d 523, 532 (Pa. 2009) (quoting 42 Pa.C.S.A. § 9543(a)(2)(ii)). "[C]ounsel is presumed to be effective, and the petitioner bears the burden of proving to the contrary." ***Commonwealth v. Brown***, 196 A.3d 130, 150 (Pa. 2018). "As a general and practical matter, it

is more difficult for a defendant to prevail on a claim litigated through the lens of counsel ineffectiveness, rather than as a preserved claim of trial court error." ***Commonwealth v. Charleston***, 94 A.3d 1012, 1019 (Pa. Super. 2014) (citing ***Commonwealth v. Gribble***, 863 A.2d 455, 472 (Pa. 2004)).

To overcome the presumption of counsel's effectiveness, a PCRA petitioner must plead and prove each of the following three prongs:

> (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different. ***Commonwealth v. Chmiel***, 30 A.3d 1111, 1127 (Pa. 2011) (employing ineffective assistance of counsel test from ***Commonwealth v. Pierce***, 527 A.2d 973, 975-76 (Pa. 1987)). … Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim.

***Commonwealth v. Treiber***, 121 A.3d 435, 445 (Pa. 2015) (citations modified). "We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case." ***Commonwealth v. Evans***, 303 A.3d 175, 182 (Pa. Super. 2023)).

> If a petitioner fails to prove any … prong[] [of the ineffectiveness test], his claim fails. Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. Where matters of strategy and tactics are concerned, a finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. To demonstrate prejudice, the petitioner must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

*Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014) (citations, quotation marks, and brackets omitted).

In his first issue, Appellant argues trial counsel rendered ineffective assistance by failing to move for suppression of evidence obtained from the iPhone in Appellant's possession at the time of his arrest. Appellant's Brief at 16-24. Appellant asserts that the police's actions of powering on the iPhone and calling the suspected number to confirm the iPhone's connection with that number constituted a warrantless search of the iPhone. *Id.* at 18-19. Appellant argues that the United States Supreme Court's June 25, 2014, decision in *Riley v. California*, 573 U.S. 373 (2014), held that police must obtain a warrant before accessing any information from a cell phone. Appellant's Brief at 16. Appellant maintains the initial warrantless search of the iPhone was therefore subject to suppression under *Riley*, and that trial counsel lacked a reasonable basis for not seeking suppression. *Id.* at 18-22.

Appellant further argues the warrant police subsequently obtained for the iPhone derived from the initial warrantless search, and the evidence acquired under the warrant was also subject to suppression. *Id.* at 22-23. Appellant asserts the evidence obtained from the iPhone was crucial to the Commonwealth's case against him, and that he was therefore prejudiced by trial counsel's failure to seek suppression. *Id.* at 22-24. In arguing *Riley*

required suppression, Appellant cites to the Pennsylvania Supreme Court's application of **Riley** in **Commonwealth v. Fulton**, 179 A.3d 475 (Pa. 2018), and this Court's application of **Riley** in **Commonwealth v. Stem**, 96 A.3d 407 (Pa. Super. 2014), and **Commonwealth v. Prater**, 256 A.3d 1274 (Pa. Super. 2021). **See** Appellant's Brief at 16-22.

The Commonwealth's brief neither cites nor mentions **Riley**. **See generally** Commonwealth Brief. Rather, the Commonwealth characterizes Appellant's argument as "rel[ying] heavily upon" **Fulton**. **Id.** at 20. Noting that our Supreme Court decided **Fulton** in 2018—after Appellant's trial had already concluded—the Commonwealth argues trial counsel "cannot be deemed ineffective for failing to anticipate a change in the law…." **Id.** at 21 (quoting **Commonwealth v. Parker**, 249 A.3d 590, 596 (Pa. Super. 2021)).

> This Court has held
>
> > that "[t]he failure to file a suppression motion under some circumstances may be evidence of ineffective assistance of counsel." **Commonwealth v. Metzger**, 441 A.2d 1225, 1228 (Pa. Super. 1981); **see also Commonwealth v. Ransome**, 402 A.2d 1379, 1381 (Pa. 1979). "However, if the grounds underpinning that motion are without merit, counsel will not be deemed ineffective for failing to so move." **Metzger**, 441 A.2d at 1228. "[T]he defendant must establish that there was no reasonable basis for not pursuing the suppression claim and that if the evidence had been suppressed, there is a reasonable probability the verdict would have been more favorable." **Commonwealth v. Melson**, 556 A.2d 836, 839 (Pa. Super. 1989).

**Commonwealth v. Watley**, 153 A.3d 1034, 1044 (Pa. Super. 2016) (some citations modified); **see also Commonwealth v. Johnson**, 179 A.3d 1153,

1160 (Pa. Super. 2018) ("[W]here a defendant alleges that counsel ineffectively failed to pursue a suppression motion, the inquiry is whether the failure to file the motion is itself objectively unreasonable, which requires a showing that the motion would be meritorious." (citing *Melson*, 556 A.2d at 839)). "[C]ounsel's stewardship must be judged under the existing law at the time of trial and counsel cannot be deemed ineffective for failing to predict future developments or changes in the law." *Commonwealth v. Colon*, 230 A.3d 368, 377 (Pa. Super. 2020) (citation omitted).

Our inquiry as to whether Appellant's suppression claim would have been meritorious requires an in-depth discussion of *Riley* and its progeny. In *Riley*, the United States Supreme Court unanimously held that police "must generally secure a warrant before conducting" searches "of data on cell phones" seized incident to arrest. *Riley*, 573 U.S. at 386. The decision involved two consolidated appeals, *Riley v. California* and *Wurie v. United States*.[21]

In *Riley*, police seized a smartphone from Riley incident to his arrest for possession of a concealed firearm. *Id.* at 378-79. Police accessed the phone and found messages, contacts, photos, and videos indicative of Riley's involvement in gang activity. *Id.* at 379. The information obtained from the

---

[21] We sometimes refer to the decision as *Riley*/*Wurie*, and refer solely to *Wurie* when discussing the facts of Wurie's case.

phone led to Riley being charged with and convicted of an earlier shooting, and receiving an enhanced sentence for gang activity. *Id.* at 379-80.

In *Wurie*, police seized a flip phone from Wurie incident to his arrest for engaging in a drug transaction. *Id.* at 380. Police thereafter noticed the phone "repeatedly receiving calls from a source identified as 'my house' on the phone's external screen." *Id.* Police "opened the phone and saw a photograph of a woman and a baby set as the phone wallpaper." *Id.* Police accessed the phone's call log and contacts list to determine the phone number saved as "my house." *Id.* Using an online directory, police identified the address associated with that number. *Id.* When police went to that address, "they saw Wurie's name on a mailbox and observed through a window a woman who resembled the woman in the photograph on Wurie's phone." *Id.* at 380-81. On the basis of this information, police obtained a warrant to search the residence, where they found drugs and a firearm. *Id.* at 381.

Regarding the Fourth Amendment, the *Riley* Court observed as follows:

> As the text makes clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Our cases have determined that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, … reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). Such a warrant ensures that the inferences to support a search are "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948). In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. *See Kentucky v. King*, 563 U.S. 452, 459-61 (2011).

*Riley*, 573 U.S. at 381-82 (citations modified).

The *Riley* Court noted one longstanding exception to the warrant requirement is the search of an arrestee's person incident to a lawful arrest. *Id.* at 382-83. In *Chimel v. California*, 395 U.S. 752 (1969), the Court explained that warrantless searches of an arrestee's person were reasonable to protect officer safety and prevent the concealment or destruction of evidence. *Riley*, 573 U.S. at 383 (citing *Chimel*, 395 U.S. at 762-63). In *United States v. Robinson*, 414 U.S. 218 (1973), the Court

> reject[ed] the notion that "case-by-case adjudication" was required to determine "whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." *Robinson*, 414 U.S. at 235. As the Court explained, "[t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Id.* Instead, a "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification." *Id.*

*Riley*, 573 U.S. at 384 (citations modified). The Court later "clarified that this exception was limited to 'personal property … immediately associated with the person of the arrestee.'" *Id.* (quoting *United States v. Chadwick*, 433 U.S. 1, 15 (1977) (200-pound, locked footlocker could not be searched incident to arrest)).

The *Riley* Court acknowledged its obligation

> to decide how the search incident to arrest doctrine applies to modern cell phones, which are now such a pervasive and insistent

part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy. A smart phone of the sort taken from Riley was unheard of ten years ago; a significant majority of American adults now own such phones. *See* A. Smith, Pew Research Center, Smartphone Ownership—2013 Update (June 5, 2013). Even less sophisticated phones like Wurie's, which have already faded in popularity since Wurie was arrested in 2007, have been around for less than 15 years. Both phones are based on technology nearly inconceivable just a few decades ago, when *Chimel* and *Robinson* were decided.

Absent more precise guidance from the founding era, we generally determine whether to exempt a given type of search from the warrant requirement "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300 … (1999). Such a balancing of interests supported the search incident to arrest exception in *Robinson*, and a mechanical application of *Robinson* might well support the warrantless searches at issue here.

But while *Robinson*'s categorical rule strikes the appropriate balance in the context of physical objects, neither of its rationales has much force with respect to digital content on cell phones. On the government interest side, *Robinson* concluded that the two risks identified in *Chimel*—harm to officers and destruction of evidence—are present in all custodial arrests. There are no comparable risks when the search is of digital data. In addition, *Robinson* regarded any privacy interests retained by an individual after arrest as significantly diminished by the fact of the arrest itself. Cell phones, however, place vast quantities of personal information literally in the hands of individuals. A search of the information on a cell phone bears little resemblance to the type of brief physical search considered in *Robinson*.

We therefore decline to extend *Robinson* to searches of data on cell phones, and hold instead that officers must generally secure a warrant before conducting such a search.

*Riley*, 573 U.S. at 385-86.

The ***Riley*** Court analyzed the government interests in protecting officer safety and preventing evidence destruction, and determined these interests did not justify dispensing with the warrant requirement with respect to data on cell phones. ***Id.*** at 386-91; ***see also id.*** at 387 ("Digital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape."), 388 ("Both Riley and Wurie concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant. … And once law enforcement officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone.").

The ***Riley*** Court further determined ***Robinson***'s reliance on an arrestee's "reduced privacy interests" in physical items on his person did not apply to data on cell phones. ***Id.*** at 292-93 (citing ***Robinson***, 414 U.S. at 232). "Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." ***Id.*** at 393. ***Riley*** recognized that cell phones have "immense storage capacity" and often contain highly personal information. ***Id.*** at 393, 394-97; ***see also id.*** at 395 ("[T]here is an element of pervasiveness that characterizes cell phones but not physical records. Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. … [I]t is no exaggeration to say that many of the more than 90% of

American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate.").

> In 1926, Learned Hand observed (in an opinion later quoted in **Chimel**) that it is "a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him." **United States v. Kirschenblatt**, 16 F.2d 202, 203 ([2d Cir. 1926]).  If his pockets contain a cell phone, however, that is no longer true.  Indeed, a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is.

**Riley**, 573 U.S. at 396-97 (italics in original).

Pertinently, **Riley** rejected arguments of the United States and California in favor of "various fallback options for permitting warrantless cell phone searches under certain circumstances."  **Id.** at 398.  The Court determined

> [e]ach of the proposals is flawed and contravenes our general preference to provide clear guidance to law enforcement through **categorical rules**.  "[I]f police are to have workable rules, the balancing of the competing interests … 'must in large part be done **on a categorical basis—not in an *ad hoc*, case-by-case fashion** by individual police officers.'"

**Id.** (quoting **Michigan v. Summers**, 452 U.S. 692, 705 n.19 (1981) (emphasis added).  One of the proposed fallback options was the suggestion that

> officers could search cell phone data if they could have obtained the same information from a pre-digital counterpart.  **See** Tr. of Oral Arg. … at 38-43; **see also** [**United States v.**] **Flores-Lopez**, 670 F.3d [803,] 807 [(7th Cir. 2012)] ("If police are entitled to

- 44 -

open a pocket diary to copy the owner's address, ***they should be entitled to turn on a cell phone to learn its number***.").

***Riley***, 573 U.S. at 400 (emphasis added). The ***Riley*** Court rejected this argument, recognizing that it would not only result in a "significant diminution of privacy," but would also "launch courts on a difficult line-drawing expedition to determine which digital files are comparable to physical records" and would "keep defendants and judges guessing for years." ***Id.*** at 401 (citation omitted).

> The ***Riley*** Court clarified that its

> holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest. Our cases have historically recognized that the warrant requirement is "an important working part of our machinery of government," not merely "an inconvenience to be somehow 'weighed' against the claims of police efficiency." ***Coolidge v. New Hampshire***, 403 U.S. 443, 481 … (1971).

***Riley***, 573 U.S. at 401. ***Riley*** confirmed that "even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions," such as the exigent circumstances exception, "may still justify a warrantless search of a particular phone." ***Id.*** at 401-02.

> ***Riley*** concluded as follows:

> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life," ***Boyd*** [***v. United States***, 116 U.S. 616,] 630 [(1886)]…. The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. **Our answer to the question of**

> **what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant**.

*Riley*, 573 U.S. at 402 (emphasis added).

On July 11, 2014, this Court issued its decision in *Stem*. There, police seized a cell phone from Stem incident to his arrest for criminal trespass. *Stem*, 96 A.3d at 408. At the police station, police powered on Stem's phone and, in the course of inspecting its data, discovered a photograph depicting child pornography. *Id.* Police thereafter obtained a warrant to search the phone, which yielded more photographs depicting child pornography. *Id.* at 408-09. The trial court granted Stem's motion to suppress the photographs, and the Commonwealth appealed. *Id.* at 409. Relying exclusively on *Riley*, this Court determined the search of Stem's cell phone "undoubtedly was unconstitutional." *Id.* at 414.

On February 21, 2018, the Pennsylvania Supreme Court decided *Fulton*. There, a shooting victim identified the shooter as "Jeff," and the victim's cell phone showed several calls with a contact listed as "Jeff" in the hour before the shooting. *Fulton*, 179 A.3d at 479. Two days after the shooting, the victim died. *Id.* That same day, in connection with an apparently unrelated complaint of drug and gun activity, police arrested Fulton and three other men. *Id.* Police seized a smartphone from Fulton's person, and recovered a gun and three other cell phones from the vehicle in which Fulton had been sitting. *Id.* at 479-80. Police transferred the cell phones to

a detective (Detective Harkins), who was investigating the earlier shooting. *Id.* at 480.

Detective Harkins powered on each of the phones and searched them to discern their assigned phone numbers. *Id.* One of the phones, a flip phone, matched the number assigned to "Jeff" in the victim's phone. *Id.* After monitoring incoming calls and texts on the flip phone, Detective Harkins answered a call and identified himself as a detective investigating a homicide. *Id.* The caller agreed to meet with Detective Harkins, and identified the owner of the flip phone as "Lil Jeff," from whom the caller indicated she purchased heroin on a regular basis. *Id.* Upon being shown a photo of Fulton, the caller identified him as "Lil Jeff." *Id.*

Relying on *Riley*, our Supreme Court reversed the trial court's denial of Fulton's motion to suppress the evidence obtained from the flip phone. *Id.* at 484-89. The *Fulton* Court analyzed as follows:

> *Riley*/*Wurie* could not be clearer: in order to access any information on a cell phone, police must first obtain a warrant. The high Court created no exception for what police or courts may deem a "minimally invasive" search, as the trial court in the case at bar found…. As the above discussion of [*Riley*/*Wurie*] reveals, the United States Supreme Court expressly rejected a case-by-case approach to determining whether a warrant was required prior to accessing certain information contained in a cell phone, opting instead to adopt a categorical rule prohibiting police from looking for any information on a cell phone without a warrant.
>
> The *Riley*/*Wurie* Court held that in the absence of an applicable exception, any search of a cell phone requires a warrant. This is because, like one's home, an individual's expectation of privacy is in the cell phone itself, not in each and every piece of information stored therein. Consequently, a

warrant is generally required for law enforcement to search a cell phone. **See Riley**/**Wurie**, [573 U.S. at 396-97] ("[A] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is [in the house].") (emphasis original).

A search occurs when police intrude upon a constitutionally protected area without the individual's explicit or implicit permission. **Florida v. Jardines**, 569 U.S. 1, 6 … (2013) (citing **United States v. Jones**, 565 U.S. 400, 406 n.3 … (2012)); **Commonwealth v. Shabezz**, … 166 A.3d 278, 288 ([Pa.] 2017). To constitute such an intrusion, the action need not uncover something "of great personal value"; even a small, seemingly insignificant act of information gathering by police in a constitutionally protected area is a search. **See Arizona v. Hicks**, 480 U.S. 321, 325 … (1987). In **Hicks**, for example, the high Court held that the act by police of moving stereo equipment to view its serial number was a search under the Fourth Amendment: "A search is a search, even if it happens to disclose nothing but the bottom of a turntable." **Id.** Any actions taken unrelated to an otherwise authorized intrusion that result in exposing "concealed portions" of an area in which a person has a protected privacy interest is, for constitutional purposes, a search. **Id.**

Our review of the record in this case reveals that Detective Harkins conducted three distinct searches of Fulton's cell phone without a warrant. The first occurred when the detective powered on the phone. The record reflects that Fulton's flip phone was one of three phones recovered by detectives investigating a separate crime unrelated to [the victim's] murder. The phones were transferred to the homicide detectives investigating [the] murder because the phones were believed to have possible evidentiary value based on [the victim's] call log, which indicated that he communicated several times with "Jeff" … within a short period of time prior to the shooting. Fulton's flip phone was off when it was received by Detective Harkins. Therefore, in order to discern the assigned number of the phone, Detective Harkins powered on the phone.

***The act of powering on Fulton's flip phone constituted a search***, *i.e.*, an intrusion upon a constitutionally protected area (Fulton's cell phone) without Fulton's explicit or implicit permission. ***See Jardines***, 569 U.S. at 6…. Turning on the phone exposed to view portions of the phone that were previously concealed and not otherwise authorized by a warrant or an exception to the warrant requirement. ***See Hicks***, 480 U.S. at 325…. ***Powering on the phone is akin to opening the door to a home.*** It permitted police to obtain and review a host of information on the cell phone, including viewing its wallpaper, reviewing incoming text messages and calls, and accessing all of the data contained in the phone.

***Detective Harkins engaged in a second warrantless search when he obtained the phone's assigned number***. After powering on the phone, Detective Harkins navigated through the menus of the flip phone to obtain its number. By virtue of this search, Detective Harkins learned that the number assigned to Fulton's flip phone was the same number labeled as "Jeff" in [the victim's] phone. As stated above, the ***Riley***/***Wurie*** Court rejected the ***Flores-Lopez*** decision and its conclusion that accessing a cell phone to obtain its phone number was permissible without a warrant. ***See Riley***/***Wurie***, [573 U.S. at 400]. The act of navigating the menus of a cell phone to obtain the phone's number is unquestionably a search that required a warrant.

Detective Harkins conducted a third warrantless search of the phone when he monitored incoming calls and text messages. To aid in his investigation of [the] murder, he kept the phone powered on, monitoring the calls and text messages that came through by viewing the number and/or assigned name of the individual calling or texting on the flip phone's internal or external display. …

Contrary to the finding of the trial court and the argument advanced by the Commonwealth before this Court, there is little difference between monitoring the internal and external viewing screens on a cell phone and searching the phone's call logs. Both result in accessing "more than just phone numbers," but also "any identifying information that an individual might add" to his or her contacts, including the caller's photograph, the name assigned to the caller or sender of the text message. ***See Riley***/***Wurie***, [573 U.S. at 400]. Further, and unlike a call log, monitoring a phone's incoming text messages allows the viewer to see the content of a

text message, which indisputably constitutes private data. This is all information that, pursuant to *Riley*/*Wurie*, cannot be accessed by police without a warrant.

The rule created by *Riley*/*Wurie* is exceedingly simple: if a member of law enforcement wishes to obtain information from a cell phone, get a warrant. The failure to do so here violated *Fulton*'s rights under the Fourth Amendment to the United States Constitution.

*Fulton*, 179 A.3d at 487-89 (emphasis added; footnote and record citations omitted).

On July 9, 2021, this Court decided *Prater*. There, an anonymous individual called 911 and stated the victim "was going to kill herself with a bomb." *Prater*, 256 A.3d at 1279. After police informed the victim about the 911 call, she found a pipe bomb in her basement, and police found Prater's fingerprint on a bag nearby. *Id.* Prater had been previously charged with harassing the victim on multiple occasions. *Id.* Police arrested Prater and seized a cell phone from his person. *Id.* A detective dialed the phone number associated with the 911 call. *Id.* at 1285. Prater's cell phone rang, and the detective "looked at the originating number displayed on [Prater's] cell phone and recognized it as the number that he had just dialed [from]." *Id.*

Following his conviction in a **2012** jury trial, Prater filed a PCRA petition claiming that his counsel rendered ineffective assistance in failing to seek suppression of the evidence obtained from his cell phone. *Id.* The *Prater* Court determined the claim lacked arguable merit because,

at the time of [Prater's] trial and direct appeal, the law relating to warrantless searches of cell phones did not require suppression.

The law on this subject did not change until after the conclusion of [Prater's] direct appeal. His trial attorney cannot be found ineffective for failing to anticipate this change.

....

At the time of [Prater's] trial in 2012 and direct appeal over the next two years, Pennsylvania law provided that when the police seized a cell phone found in plain view during the execution of a valid search warrant, the police were not required to obtain a second warrant before searching the cell phone's memory chip. *Commonwealth v. McEnany*, 667 A.2d 1143, 1149 (Pa. Super. 1995).

*Prater*, 256 A.3d at 1285 (footnote omitted).

After briefly summarizing *Riley*, *Stem*, and *Fulton*, the *Prater*

Court opined that,

[h]ad these decisions been in existence at the time of [Prater's] prosecution, [Prater's] attorney might have had reason to file a motion to suppress on the ground that [the detective] violated his constitutional rights by looking at the number displayed on [Prater's] cell phone without a warrant. These decisions, however, were not in effect at the time of [Prater's] trial. The first case in this chain, *Riley*, was not issued until June 25, 2014, one month after the conclusion of [Prater's] direct appeal. The law in effect at the time of trial, *McEnany*, did not support a motion to suppress. Because "counsel's stewardship must be judged under the existing law at the time of trial," counsel "cannot be deemed ineffective for failing to predict future developments or changes in the law," *Colon*, 230 A.3d at 377, such as *Riley*, *Stem*, and *Fulton*.

*Prater*, 256 A.3d at 1286 (citation modified).

Instantly, the PCRA court determined Appellant's claim that trial counsel should have moved to suppress the iPhone evidence lacked arguable merit. PCRA Court Opinion, 2/21/25, at 12. The PCRA court noted Appellant "relies on [*Riley*/*Wurie*] for the principle that the search of cell phone data without

a warrant is unconstitutional in the absence of an applicable [warrant] exception…." *Id.* After briefly recounting the facts of *Riley* and *Wurie*, the PCRA court observed the *Riley* Court

> rejected law enforcement's arguments relative to exceptions to warrant requirements, based upon the nature of information and data stored in modern cell phones. *Riley*, 573 U.S. at 402-03. The *Riley* Court did rule that cell phones are not entirely immune from searches, noting that nothing prevented law enforcement from obtaining a warrant to search a cell phone or that[,] under certain factual scenarios, an exigent circumstances exception may apply. *See id.* at 401-02.

> [Appellant] also relies heavily on … *Fulton*, a 2018 decision from the Supreme Court of Pennsylvania[,] for the proposition that any access to a suspect's cell phone is a warrant[-]required search. Notably, as [Appellant] points out, … [the *Fulton*] Court … held that the act of a detective in simply powering on one of three cell phones found on the defendant in order to confirm its assigned number was a search requiring a warrant. *Fulton*, 179 A.3d at 488. …

> The inquiry does not end here[,] however. As the Commonwealth points out, the facts in *Fulton* are distinguishable from the case *sub judice* in an important way: by powering on Fulton's phone, the detective was able to move through the phone's various menus and logs, gaining further information—acts which the *Fulton* Court determined constituted separate searches[. *Id.*] … In this case, [MSP's] only action was to power on the [iPhone] and call the [suspected] number that had been developed through separate investigative techniques, not through navigating … the phone's menus. Neither [MSP] nor [PSP] were able to access [Appellant's] white iPhone in the way that Detective Harkins was able to access Fulton's flip phone. This was because [Appellant's] iPhone was password[-]protected, and at that time law enforcement did not have the password. This fact not only prevented the police search of [Appellant's] phone to the extent of that in *Fulton*, but it necessitated [PSP] to get two search warrants for [Appellant's] iPhone: originally to search the phone and[,] having been confounded by the [iPhone's] password protection and the first warrant having expired, the [second] to have the iPhone "forensically examined" by a "forensic examiner,"

bypassing the password. Neither … [PSP] nor [MSP] were able to gain the extent of information that Detective Harkins in **Fulton** could [gain] simply by powering up the phone. [As to any information beyond] confirming the [iPhone's] assigned number, [PSP] sought and obtained two search warrants.

It is true[,] however[,] that the [**Fulton**] Court found the ruling in **Riley** to be conclusive—"that in the absence of an applicable exception, **any search** of a cell phone requires a warrant." **Fulton**, 179 A.3d at 487 (emphasis in original). Moreover, the **Fulton** Court noted that the **Riley** Court explicitly rejected the argument that the Commonwealth sought to advance in **Fulton**, [*i.e.*,] that a case-by-case approach could be used in determining when a warrant would be required. **Id.** ("**Riley**/**Wurie** could not be clearer: in order to access any information on a cell phone, police must first obtain a warrant."). Still, **Fulton** is a 2018 decision[. D]uring the pretrial portion of [the instant] case and up to and through trial, [**Fulton**] had not yet been decided. At that point, there was no decisional law in Pennsylvania that held that simply powering on a cell phone to confirm its assigned number was a search.

PCRA Court Opinion, 2/21/25, at 8-11 (footnotes omitted; some citations modified).

The PCRA court then quoted trial counsel's testimony from the PCRA evidentiary hearing regarding whether trial counsel considered seeking suppression of the iPhone evidence:

Q [Appellant's counsel]: So … this was the warrant for the phone and you would agree that it mentions that [PSP] directed [MSP] to turn the phone on and call it, correct?

A [Trial counsel]: That's what it says, yes.

Q: Did that give you any concerns about moving to suppress the phone[,] that [MSP] at the direction of [PSP] had already searched the phone before [PSP] got this search warrant for the phone?

A: I don't recall whether we did or I didn't…. No recollection. I don't know whether—you're saying that they turned on the phone.

I don't see anything in here that says [they] searched the phone[,] but I don't recall.

Q: They turned on the phone and called the number that they had [in order] to see if the phone rang and it did?

A: Okay, that's—I agree that's what it says. I don't think it says they searched the phone but I don't recall anything else.

Q: Okay. Is that something—do you see any grounds for a motion to suppress there?

A: … I mean, I don't remember presently what the law was in 2015. I'm sure the law in 2015 is different than it is in 2024 related to the need for warrants on certain items, so I don't—you need to apply the law as it was in 2015, not now, if that's what you're implying.

Q: Absolutely.

A: I don't recall what the law was in 2015. To me[,] … thinking at this point[,] turning on the phone and calling it, I don't see that as a search, but I don't recall what we did related to that—what I did related to that. There was obviously a co-defendant involved[, Reed, whose counsel] I worked somewhat cooperatively with in some matters.

…

Q: … Do you have any specific recollection for this case of why you did not … file a motion to suppress the phone?

A: No. At this point I didn't—until you referenced this I don't recall this—reading this or any issue related to that.

*Id.* at 11-12 (quoting N.T., 10/3/24, at 13-15).

The PCRA court found this testimony indicated that trial counsel "did not specifically recall" whether he considered a potential suppression issue with respect to the police's actions of powering on the iPhone and calling the suspected number to confirm the iPhone's connection with that number. *Id.* at 12. The PCRA court continued as follows:

[Trial counsel] is correct[,] however[,] when he supposed that the law in 2015 [wa]s different than the law in 2024[,] in that such an action would constitute a search. The **Fulton** Court made that clear in February of 2018. However, that was six months after the trial in this case. We therefore cannot hold [trial counsel] accountable for not moving to suppress the iPhone in 2016 and 2017[,] when the Supreme Court of Pennsylvania did not reach its decision until 2018.

Because … **Fulton** was not the law in 2016 or 2017, the underlying legal claim—that [trial counsel should have moved to suppress the phone—lacks legal merit. Accordingly, [the PCRA court] find[s] that [Appellant] has not met the first prong of the **Strickland**/**Pierce** analysis. Because [Appellant] has not met the first prong[,] … we need not analyze this issue further.

**Id.**

We are constrained to disagree with the PCRA court's analysis. The PCRA court opined that **Fulton** "made … clear" that powering on a cell phone and confirming its assigned number constitutes a search, **id.**, but neither the PCRA court nor the Commonwealth identifies any pre-**Fulton** law supporting a conclusion that such actions did not constitute a search. Indeed, the Commonwealth fails to specifically argue that the police's actions did not constitute a search under the law as it existed at the time of Appellant's trial. **See generally** Commonwealth Brief. While the Commonwealth argues Appellant's claim must fail because it "relies heavily" on **Fulton**, **id.** at 20, the Commonwealth neglects to explain which aspects of **Fulton** it contends constituted new law. **See generally id.** We reiterate that the Commonwealth's brief neither cites nor mentions **Riley**, and accordingly fails to address Appellant's argument that **Riley** compelled suppression here. **Id.**

Our review of the law existing at the time of Appellant's trial confirms that the police's actions—powering on the iPhone, calling the suspected number, and thereby confirming the iPhone's connection with that number—constituted a search.

> The threshold question … in any Fourth Amendment inquiry is whether the conduct of the police amounted to a search. A search occurs when the government intrudes on an area where a person has a "constitutionally protected reasonable expectation of privacy."

*Commonwealth v. Robbins*, 647 A.2d 555, 558 (Pa. Super. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)); *see also Commonwealth v. English*, 839 A.2d 1136, 1139 (Pa. Super. 2003) ("A search within the meaning of the Fourth Amendment occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed."). An intrusion into a constitutionally-protected area constitutes a search even if it "uncover[s] nothing of great personal value…." *Hicks*, 480 U.S. at 325.

As discussed above, *Riley* recognized a constitutionally-protected, reasonable expectation of privacy in "data on cell phones[.]" *Riley*, 573 U.S. at 386. Instantly, Appellant argues police accessed data on the iPhone by turning it on, calling the suspected number, and looking at the iPhone's screen as it rang. Appellant's Brief at 18. Appellant asserts that, via these actions, police actually "generated" data on the iPhone, and this data confirmed the iPhone's connection with the suspected number. *Id.* ("It is … important to

note that in this case, police did not just look at a phone which was already ringing in plain view."); *see also id.* at 19 ("[P]olice only obtained the data by manipulating" the iPhone). We agree with Appellant that these actions constituted a police intrusion into the iPhone's data and, therefore, a search. *See Robbins*, 647 A.2d at 558; *Riley*, 573 U.S. at 386.

We reach this conclusion without relying on *Fulton* or any other caselaw decided after Appellant's trial. *Fulton* did not expand the parameters of what constitutes a search, but merely applied established law to the facts of the case before it. *See Fulton*, 179 A.3d at 487-88 (citing, on the question of whether a search occurred, *Riley*, *Hicks*, *Jardines*, and *Shabezz*). Here, the PCRA court failed to apply the law as it existed before Appellant's trial to determine whether the police's actions constituted a search of the iPhone. *See* PCRA Court Opinion, 2/21/25, at 8-12. The PCRA court did not deny that police accessed the iPhone's data, and did not attempt to reconcile that access with *Riley*'s recognition of a constitutionally-protected privacy interest in cell phone data. *See id.*

The PCRA court opined that *Fulton* "made … clear" that powering on a cell phone and confirming its assigned number constitutes a warrant-required search, *id.* at 12, but our review discloses that point had already been made

clear in **Riley**.[22] As discussed above, **Riley** announced a categorical rule that police "must generally secure a warrant before conducting" searches "of data on cell phones…." **Riley**, 573 U.S. at 386. The **Riley** Court rejected various case-by-case approaches suggested by the United States and California, including the suggestion that "officers could search cell phone data if they could have obtained the same information from a pre-digital counterpart." **Id.** at 400. To exemplify this suggested approach, the **Riley** Court cited the Seventh Circuit's decision in **Flores-Lopez**. **Id.** (citing **Flores-Lopez**, 670 F.3d at 807 ("If police are entitled to open a pocket diary to copy the owner's address, *they should be entitled to turn on a cell phone to learn its number*.")) (emphasis added). **Riley**'s explicit rejection of **Flores-Lopez**'s approach signaled that, post-**Riley**, police were not entitled to turn on a cell phone to learn its number without first obtaining a warrant.[23]

_____

[22] Pennsylvania courts are "bound by the determinations of the United States Supreme Court on issues of federal law, including the construction and interpretation of the federal constitution[.]" **Commonwealth v. DeJesus**, 266 A.3d 49, 54 (Pa. Super. 2021). We observe that the **Fulton** Court rested its decision solely on the Fourth Amendment, and did not separately apply the state constitution. **See Fulton**, 179 A.3d at 479 n.3.

[23] In **Flores-Lopez**, after seizing a cell phone from Flores-Lopez incident to his arrest for a drug transaction, police searched the cell phone to learn its assigned number. **Flores-Lopez**, 670 F.3d at 804. Police used that number to subpoena the phone's call history from the service provider, which was introduced at trial as evidence of Flores-Lopez's involvement in a drug-trafficking conspiracy. **Id.** The Seventh Circuit upheld the phone search as a lawful search incident to arrest, relying on **Robinson** and analogizing the police's "slight" intrusion into the phone to learn its number with the police's

*(Footnote Continued Next Page)*

Appellant argues that "[t]rial counsel did not have to wait for **Fulton** to be decided to know that he should file a motion to suppress" the warrantless search of the iPhone. Appellant's Brief at 22. Appellant asserts "[t]rial counsel should have moved to suppress" the search "because … **Riley** and **Stem** had already been decided" before Appellant's trial. **Id.** at 20.[24] Appellant maintains "**Fulton** was not a significant change in the governing law; the issue was already largely decided by **Riley**/**Wurie** and **Stem**." **Id.** at 22.

We agree. **Fulton** did not extend **Riley**; rather, it recognized that "**Riley** could not be clearer[.]" **Fulton**, 179 A.3d at 316. The Commonwealth's attempt to recast Appellant's argument as dependent on **Fulton** is unpersuasive, especially in light of the Commonwealth's failure to

_____

action of opening "Robinson's cigarette pack, in which heroin was found." **Id.** at 809 (citing **Robinson**, 414 U.S. at 235).

On March 13, 2017, in **United States v. Jenkins**, 850 F.3d 912 (7th Cir. 2017), the Seventh Circuit recognized that **Riley** had "upended" **Flores-Lopez**. **Jenkins**, 850 F.3d at 918. In **Jenkins**, police seized three cell phones from Jenkins in connection with his arrest for drug possession. **Id.** at 916. Police had previously intercepted calls between Jenkins and a suspected drug trafficker. **Id.** at 915. Police searched the settings on the one of the phones seized from Jenkins and learned its assigned number, which matched the number used in the intercepted calls. **Id.** at 916. Before the Seventh Circuit, the government "concede[d] that the warrantless search of Jenkins' cell phone was unlawful in light of **Riley**." **Id.** at 918.

[24] Appellant also argues **Prater** involved a search substantially identical to the instant one, and that the **Prater** Court "specifically considered both" **Riley** and **Stem** "as two of the three decisions" (along with **Fulton**) "that would have required suppression had they been decided by the time of Prater's trial." Appellant's Brief at 18 (citing **Prater**, 256 A.3d at 1286).

discuss ***Riley***. We therefore determine Appellant established that a suppression motion challenging the initial warrantless search of the iPhone would have been meritorious.[25] ***See Johnson***, 179 A.3d at 1160.

Appellant further argues that suppression of the evidence obtained via the initial warrantless search of the iPhone also requires suppression of the evidence obtained via the subsequent warrant, as the warrant application relied heavily on PSP's confirmation of the iPhone's connection with the suspected number. ***See*** Appellant's Brief at 19, 22, 24. Neither the PCRA court nor the Commonwealth addresses this argument. ***See generally*** PCRA Court Opinion, 2/21/25; Commonwealth Brief.

As our Supreme Court has observed,

> [t]he law is clear that where some evidence contained in a search warrant affidavit is unlawfully obtained, we must consider whether the affidavit nonetheless sets forth probable cause in the absence of such evidence. ***Commonwealth v. Shaw***, … 383 A.2d 496, 501

---

[25] We observe that the Commonwealth does not argue that any warrant exception applied, nor does it argue for the application of any exception to the exclusionary rule, such as the inevitable discovery or independent source doctrines. ***See generally*** Commonwealth Brief. The exclusionary rule

> provides that evidence obtained due to an unconstitutional search or seizure cannot be used against a defendant. ***See Weeks v. United States***, 232 U.S. 383 … (1914). The exclusionary rule also applies to any evidence discovered as a result of the original illegal police conduct; such evidence is termed "fruit of the poisonous tree." ***Nardone v. United States***, 308 U.S. 338, 341 … (1939).

***Commonwealth v. Wiliams***, 2 A.3d 611, 619 (Pa. Super. 2010) (*en banc*); ***see also id.*** at 618-19 (discussing the inevitable discovery and independent source doctrines).

([Pa.] 1978). In other words, we must decide whether, absent the information obtained through illegal activity, probable cause existed to issue the warrant. *Id.* at 502.

*Commonwealth v. Hernandez*, 935 A.2d 1275, 1283-84 (Pa. 2007). "Probable cause exists where, based upon a totality of the circumstances set forth in the affidavit of probable cause, ... there is a fair probability that ... evidence of a crime will be found **in a particular place**." *Commonwealth v. Lyons*, 79 A.3d 1053, 1064 (Pa. 2013) (quotation marks omitted; emphasis added).

Instantly, the warrant application included the unlawfully-obtained information not only in the affidavit of probable cause, but in the very description of the item to be searched. *See* Application for Search Warrant, 1/19/16, at 1 (describing the item to be searched as a white iPhone "seized from the person of [Appellant] following his arrest, **which was confirmed to be associated with the** [**suspected number**] **belonging to** [**Appellant**]." (emphasis added)). Our review of the affidavit discloses that probable cause to search a cell phone wholly depended on the information PSP had already developed regarding the suspected number. *See* Affidavit of Probable Cause, 1/19/16, at 4. Absent this information, the affidavit articulated no basis for concluding evidence of the crimes would be found on any cell phone. *See generally id.*

We reiterate that Appellant possessed two cell phones at the time of his arrest. N.T., 9/21/17, at 19. The iPhone's association with the suspected

number—information unlawfully obtained via warrantless search—was the crucial fact demonstrating that evidence of the crimes would probably be found *on the iPhone*. Without this critical link, the affidavit set forth no probable cause to search the iPhone.[26] Accordingly, we agree with Appellant that the evidence obtained via the warrant would have been subject to suppression.[27]

_____

[26] We do not doubt that, before PSP's warrantless search, PSP could have articulated probable cause to support a search warrant limited to determining whether the iPhone was connected with the suspected number.

[27] In light of this determination, we need not address Appellant's second issue in detail. In that issue, Appellant contends certain evidence obtained via the search warrant (in particular, the rap lyrics and any text messages dated before December 13, 2015) exceeded the scope of the warrant, and therefore, trial counsel should have moved to suppress them. **See** Appellant's Brief at 24-36. We observe that the PCRA court and the Commonwealth agree that the pre-December 13, 2015, text messages exceeded the warrant's scope. **See** PCRA Court Opinion, 2/21/25 at 14; Commonwealth Brief at 28-29. Regarding the rap lyrics, the PCRA court and the Commonwealth rely on **Commonwealth v. Moser**, 283 A.3d 850 (Pa. Super. 2022), which broadly interpreted the term "messages" in a search warrant to include unsent draft messages contained in a cell phone's Notes application. **See Moser**, 283 A.3d at 854-55; **see also** PCRA Court Opinion, 2/21/25, at 17-19; Commonwealth Brief at 24-28.

However, assuming *arguendo* that (per **Moser**) the iPhone's Notes application was within the warrant's scope and the rap lyrics constituted "messages," the PCRA court and the Commonwealth nevertheless fail to explain how the rap lyrics satisfied the warrant's other limiting language, which specified the messages to be seized as those mentioning certain names and "keywords/phrases," none of which are mentioned in the rap lyrics. **See** Application for Search Warrant, 1/19/16, at 1 (description of the items to be searched for and seized); N.T., 9/20/17, at 153-57 (Trooper Baney reading the rap lyrics at trial).

For the foregoing reasons, we determine Appellant established that his underlying suppression claim has arguable merit, and therefore satisfies the first prong of the **Strickland**/**Pierce** analysis.

We further determine Appellant established that trial counsel lacked a reasonable basis for not filing a motion to suppress. The PCRA court found trial counsel had no recollection as to whether he considered the suppression issue. **See** PCRA Court Opinion, 2/21/25, at 11. Trial counsel acknowledged that cell phone evidence was "the crux of how [Appellant] was convicted[.]" N.T., 10/3/24, at 8. Trial counsel testified that if he "could have excluded the use of [Appellant's] cell phone in evidence," he would have tried to do so. **Id.** Trial counsel suggested the relevant law before Appellant's trial differed from the law at the time of the PCRA evidentiary hearing. **See id.** at 14, 40. However, trial counsel's testimony evinced no awareness of **Riley** or any other particular caselaw. **Id.** at 14 (trial counsel testifying, "I don't recall what the law was in 2015"). To the extent trial counsel believed the law existing before Appellant's trial did not support a motion to suppress, our above discussion demonstrates that belief was not reasonable.

Finally, we determine Appellant established that he suffered prejudice as a result of trial counsel's failure to seek suppression of the iPhone evidence. To satisfy the prejudice prong of the ineffectiveness test, a PCRA petitioner must

> prove **actual prejudice**, that is, a reasonable probability that, but for counsel's lapse, the result of the … proceeding would have

been different. ***Strickland v. Washington***, 466 U.S. 668, 694 (1984). "In making this determination, a court hearing an ineffectiveness claim must consider the **totality of the evidence** before the judge or jury…. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." ***Id.*** at 695-96 (emphasis added). Ultimately, a reviewing court must question the reliability of the proceedings and ask whether "the result of the particular proceeding [was] unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." ***Id.*** at 696.

***Commonwealth v. Lesko***, 15 A.3d 345, 383 (Pa. 2011) (emphasis in original; citations modified); ***see also Commonwealth v. Collins***, 957 A.2d 237, 244 (Pa. 2008) ("A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." (citing ***Strickland***, 466 U.S. at 694)). A petitioner "claiming that counsel was ineffective for failing to move for suppression of evidence '**must establish that** … **if the evidence had been suppressed, there is a reasonable probability the verdict would have been more favorable**.'" ***Commonwealth v. Harper***, 230 A.3d 1231, 1236 (Pa. Super. 2020) (quoting ***Commonwealth v. Arch***, 654 A.2d 1141, 1143 (Pa. Super. 1995)) (emphasis added).

Instantly, our totality-of-the-evidence analysis requires clarification regarding which evidence would have been subject to suppression, and which evidence would have remained unaffected. As discussed above, Appellant's meritorious suppression claim implicates only the evidence obtained directly from the iPhone itself, including the warrantless verification of its connection

with the suspected number, and the fruits of PSP's subsequent data extraction/forensic analysis. Appellant's claim does **not** implicate the evidence obtained from Sprint, including the subscriber information and CDR/CSLI data for the suspected number.[28] Further, the claim does **not** implicate any information obtained from the co-defendants' cell phones, including their subscriber information and CDR/CSLI data, and the data extraction/forensic analysis of the physically-seized phones.

Accordingly, the Commonwealth could still have shown that the phone associated with the suspected number was present at the murder scene, and was exchanging text messages with Swindell's phone just before the murder. **See** N.T., 9/20/17, at 35-36, 119-21, 124, 132-35, 144, 148, 160, 171-74,

_____

[28] In his fourth issue, Appellant argues trial counsel rendered ineffective assistance by failing to seek suppression of the CSLI evidence for the suspected number, which was obtained via court order supported by reasonable suspicion. **See** Appellant's Brief at 57-60. Appellant relies on the United States Supreme Court's June 22, 2018, decision in **Carpenter**, which announced that police "must generally obtain a warrant supported by probable cause before acquiring [CSLI] records." **Carpenter**, 585 U.S. at 316. Though **Carpenter** was decided after Appellant's trial, Appellant maintains trial counsel should have anticipated the change in the law based on **United States v. Jones**, 565 U.S. 400 (2012). **See** Appellant's Brief at 58. We agree with and adopt the PCRA court's analysis and conclusion that this issue lacks arguable merit, as the law existing at the time of Appellant's trial did not support the underlying suppression claim. **See** PCRA Court Opinion, 2/21/25, at 24-26 (citing **Commonwealth v. Bean**, 284 A.3d 923, 2022 WL 3443667 (Pa. Super. filed Aug. 17, 2022) (unpublished memorandum) (rejecting an ineffectiveness claim where PCRA petitioner argued counsel should have anticipated **Carpenter** in light of **Jones**); **see also** Pa.R.A.P. 126(b) (unpublished non-precedential decisions of this Court filed after May 1, 2019, may be cited for persuasive value).

184-85, 187-89; *see also id.* at 158-59 (data extracted from Swindell's phone showed the text content of its text messages with the suspected number). Sprint's subscriber information listed Appellant as the suspected number's account holder, under a Hagerstown address. *Id.* at 21, 26. Swindell's phone had the suspected number saved under two contacts, "HT" and "Ocky, H-Town." *Id.* at 29-30, 160-61. The CDR/CSLI data also showed the phone associated with the suspected number was located in Hagerstown within an hour after the murder, and called Reed's phone just over two hours after the murder. *Id.* at 130, 174, 190-91, 195-96. Further, the same data showed numerous calls and text messages between the suspected number and Reed in the days, weeks, and months preceding the murder, though it did not show the content of those text messages.[29] *Id.* at 121, 148.

However, our review discloses the evidence PSP obtained directly from the iPhone was substantial, and played an important role in discrediting Appellant's defense that, at the time of the robbery, he was in Hagerstown and was not using the suspected number. *See* N.T., 9/20/17, at 43-44, 46-47, 139-40; *see also* N.T., 9/21/17, at 184-220 (Shumaker's alibi testimony). First, the simple fact that Appellant was in possession of the phone associated with the suspected number when he was arrested considerably undermined

_____

[29] PSP never obtained Reed's physical phone. *See* N.T., 9/20/17, at 115; N.T., 9/21/17, at 144. While PSP separately obtained the content of the iPhone's text messages with Swindell from Swindell's phone, the iPhone was the only source for the content of the iPhone's texts with Reed.

his effort to distance himself from that phone. This fact was significant enough that Trooper Baney described for the jury, on two separate occasions, how he directed MSP to call the suspected number, which caused the iPhone to ring. N.T., 9/20/17, at 123; N.T., 9/21/17, at 124-25. Without the evidence obtained from the iPhone, the ultimate fate of the phone associated with the suspected number would have remained a mystery at trial.

Second, the Commonwealth used the content of the iPhone's text messages to demonstrate Appellant was using the iPhone at the time of the robbery. Trooper Baney connected Appellant's use (in his police interview) of the slang word "geekin" to a text message—sent from the iPhone just before the robbery—using the same word. N.T., 9/20/17, at 138-39. Trooper Baney testified that the iPhone's user employed Appellant's "very specific and unique" slang in hundreds of other text messages.[30] *Id.* at 132; *see also id.* at 138-39, 145, 186.

Third, the Commonwealth used the content text messages recovered from the iPhone to emphasize Appellant's connection with Reed, who was firmly implicated in the robbery by much stronger evidence than that which implicated Appellant. Trooper Baney noted Appellant's frequent use of Reed's

---

[30] After Appellant introduced evidence that his nickname was "Moody," rather than "HT," "H-Town," or "Ocky," the Commonwealth highlighted a text message from "Rahjaye" (to whom the iPhone sent the critical "geekin" text) to the iPhone which referred to the recipient as "Moody," further indicating Appellant as the iPhone's user. N.T., 9/21/17, at 21-24, 128-29.

nickname, "Shottie," and highlighted Reed's texts referring to Appellant as "Ahk," suggesting a connection with "Ocky," one of the nicknames under which the suspected number was saved in Swindell's phone. *Id.* at 125-26, 186; N.T., 9/21/17, at 57-58. Trooper Baney also read text messages between Appellant and Reed from December 12, 2015, and suggested the conversation involved an unrelated illicit marijuana transaction.[31] N.T., 9/20/17, at 127-28. Additionally, PSP obtained photographs from the iPhone that were shown to the jury, including a photograph showing Appellant and Reed together, and one showing Reed holding an unrelated assault rifle. *Id.* at 149-50; N.T., 9/21/17, at 96.

Fourth, the Commonwealth used the rap lyrics to show that Appellant, who described himself as a rap musician, was the iPhone's user. N.T., 9/20/17, at 153-58. Importantly, Trooper Baney suggested the lyrics were "autobiographical,"[32] and the Commonwealth implied some of them referred

---

[31] Trooper Baney elsewhere described the robbery/murder as apparently drug-related, and testified that PSP's investigation was informed by the fact that the victim and Carbaugh sold marijuana. *See* N.T., 9/20/17, at 58-63.

[32] This Court has previously cautioned that rap lyrics generally have "limited probative value," "must be viewed with suspicion," and their admission may risk "confusing or misleading the jury." *Commonwealth v. Lehman*, 275 A.3d 513, 521 (Pa. Super. 2022).

> Viewed in their broader artistic context, … rap music evidence does not have a high probative value. Rap lyrics are not necessarily autobiographical statements; rather, rap music is a well-recognized musical genre that often utilizes exaggeration, metaphor, and

*(Footnote Continued Next Page)*

to the circumstances of the victim's murder.  N.T., 9/21/17, at 150; *see also* *id.* at 136-37.   Our review of the lyrics discloses that, though they contain no clear reference to the instant crimes, some are susceptible to such a reading. N.T., 9/20/17, at 153-57 ("my goons get em headshot guaranteed complete mission on our side he was just another victim in my eyes"; "we went for da score left wit a Qtr hit and missed me got me crossing the border"; "[I'm] runnin from da law right now").  More broadly, the lyrics portray their author as a violent, gun-toting, drug-dealing criminal, and their presentation at trial was therefore highly prejudicial to Appellant.   *Id.*; *see also* n.17 *supra* (quoting excerpts of the rap lyrics).

Our review of the trial evidence discloses that the iPhone evidence was a critical factor of the case against Appellant, because the witness testimony (summarized at length above) did not clearly implicate Appellant in the crimes. Of the six testifying eyewitnesses to the robbery (Carbaugh, B.D., and the four cooperators), only Calloway unequivocally identified Appellant at trial,

---

braggadocio for the purpose of artistic expression.  Because rap lyrics may falsely or inaccurately depict real-life events, they should not necessarily be understood as autobiographical statements.

*Id.* (quoting *United States v. Bey*, 2017 WL 1547006, at *6 (E.D. Pa. 2017) (unpublished decision)).   *But see id.* at 522 (observing that, in *Commonwealth v. Talbert*, 129 A.3d 536, 540-41 (Pa. Super. 2015), this Court determined a defendant's rap lyrics "were admissible because they had referenced specific details involved in the murder for which [the defendant] was charged, including mentions of the neighborhood of the shooting, the weapons used, the escape vehicle, and the nature of the wounds to the shooting victims.").

and only Calloway did not refer to the involvement of an unidentified (or less-than-clearly identified) individual who could have been someone other than Appellant. *See* N.T., 9/19/17, at 60-61, 111. Swindell, whose phone was exchanging text messages with the suspected number at the time of the robbery, denied sending the texts and testified he did not know Appellant or anyone nicknamed "HT." N.T., 9/13/17, at 35-36, 82-86, 89, 98. Neither Carbaugh nor B.D. identified Appellant as one of the intruders in their residence, but rather identified Swindell as the individual that the Commonwealth contended was Appellant. N.T., 9/12/17, at 111-15, 165-68, 199.

At trial, Trooper Baney acknowledged the cell phone evidence was crucial to the Commonwealth's case against Appellant. Trooper Baney agreed that none of the physical evidence analyzed by PSP's forensic laboratory linked Appellant to the crime scene. N.T., 9/21/17, at 28. Rather, Trooper Baney described the iPhone as the only "physical evidence" linking Appellant to the scene. *Id.* at 28-29. Trooper Baney testified that, apart from the cell phone evidence, only the co-defendants' identifications placed Appellant at the scene. *Id.* at 66. Trooper Baney conceded that, among the four cooperators, only Calloway clearly identified Appellant at trial, and Calloway had previously given two other versions of events that did not identify Appellant. *Id.* at 66, 152-55. Trooper Baney agreed that all four cooperators had lied to police and lied on the stand at trial. *Id.* at 55 (Trooper Baney agreeing "we have four

liars … as key prosecution witnesses"); *see also id.* (Trooper Baney agreeing that, among the five co-defendants who gave statements to police, Appellant was the only one who gave a consistent statement and did not change his story). Trooper Baney agreed that Carbaugh and B.D. were not liars, yet both had clearly testified Appellant was not one of the intruders. *Id.* at 56.[33]

Our review of the totality of the evidence discloses that the Commonwealth presented strong evidence that the user of the suspected number participated in the robbery. However, as discussed above, evidence obtained directly from the iPhone constituted a substantial portion of the Commonwealth's case that Appellant was, in fact, that user. Without the iPhone evidence, the Commonwealth's case against Appellant is "only weakly supported by the record," *Strickland*, 466 U.S. at 696, and trial counsel's failure to seek suppression of that evidence therefore "undermines confidence in the outcome of the proceeding." *Collins*, 957 A.2d at 244. Accordingly, we determine Appellant established prejudice, *i.e.*, a reasonable probability that, had the iPhone evidence been suppressed, the outcome of the trial would have been different. *See Harper*, 230 A.3d at 1236.

---

[33] In his PCRA evidentiary hearing testimony, trial counsel acknowledged the critical nature of the cell phone evidence: "[T]he key here was the phone. This was a new generation of trials where the pinging of a phone was more relevant and more credible than any witness…." N.T., 10/3/24, at 40; *see also id.* at 8 (Trial counsel testifying that cell phone evidence was "the crux of how [Appellant] was convicted").

As Appellant established each element of the *Strickland*/*Pierce* test with respect to his first issue, he is entitled to PCRA relief in the form of a new trial. We therefore reverse the PCRA court's order dismissing Appellant's PCRA petition, vacate Appellant's judgment of sentence, and remand for a new trial. In light of our disposition of Appellant's first issue, we need not dwell on his remaining issues.[34]

Order reversed. Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

P.J.E. Ford Elliott joins the opinion.

---

[34] In his third issue, Appellant argues trial counsel rendered ineffective assistance by failing to object and request a mistrial in connection with various statements made by the prosecutor, which Appellant characterizes as improperly vouching for the credibility of witnesses, or improperly eliciting sympathy and manipulating recalcitrant witnesses by referring to the presence of the victim's family in the courtroom. *See* Appellant's Brief at 36-57. To the extent this issue may be relevant in a re-trial, we agree with and adopt the PCRA court's analysis and conclusion that the claim lacks arguable merit and, alternatively, trial counsel articulated a reasonable basis for not objecting. *See* PCRA Court Opinion, 2/21/25, at 20-24.

In his fifth issue, Appellant argues trial counsel rendered ineffective assistance by failing to object to the admission of evidence referring to a .22 rifle police recovered from the Maryland residence where Appellant was arrested. *See* Appellant's Brief at 60-65; *see also* n.14 *supra*. As neither the PCRA court nor the Commonwealth disagrees with Appellant's assertion that this evidence was not admissible, the issue is not likely to resurface in a re-trial. *See* PCRA Court Opinion, 2/21/25, at 27-29 (opining that, though the issue has arguable merit, Appellant failed to establish trial counsel lacked a reasonable basis for not objecting and, alternatively, Appellant was not prejudiced by the evidence); Commonwealth Brief at 37-43. *See also* n.27, *supra* (discussing Appellant's second issue); n.28, *supra* (discussing Appellant's fourth issue).

Judge Stabile concurs in the result.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 03/17/2026